**HIRSCHFELD v. McKINLEY.** *
No. 7414.

Circuit Court of Appeals, Ninth Circuit.
May 20, 1935.

*Rehearing denied Oct. 21, 1935.

Henderson Stockton, Frank H. Lyman, and Leon S. Jacobs, all of Phœnix, Ariz., for appellant.

Thomas W. Nealon, of Phœnix, Ariz., for appellee.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

GARRECHT, Circuit Judge.

From a decree of the court below directing the trustee in bankruptcy of the Hollander Drug Company, a corporation, forthwith to make an assessment of 100 per cent. upon the company's common stock, the present appeal has been brought to this court.

In May, 1931, E. M. Hollander and Dr. R. W. Craig orally agreed that a corporation was to be formed to conduct a drug business. The drug store was to occupy premises owned by the Central Avenue Investment Company of Phœnix, Ariz., a corporation of which Dr. Craig owned the entire capital stock, except two qualifying shares. The agreement was that when the drug company was organized, $7,500 of preferred stock was to be issued to Dr. Craig for the money that he put into the enterprise, and preferred stock was to be issued to Hollander for the amount of the appraised value of the stock and fixtures belonging to the latter, as laid down in Phœnix. The appraisement later made disclosed the value of those physical assets to be $11,500.

The common stock of the new corporation was to be divided equally between Dr. Craig and Hollander. C. T. Washburn became a stockholder of the company, holding two shares of common stock, and acted as an officer solely for the convenience of Dr. Craig.

Shortly after the series of conversations that culminated in the agreement above referred to, Dr. Craig made a trip to Evansville, Ind., to investigate Hollander. That trip was made by Dr. Craig as president of the Central Avenue Investment Company, the expenses being paid by that company.

In accordance with the agreement between Dr. Craig and Hollander, and with the understanding that a corporation was to be later organized to carry out their agreement, the Hollander Drug Company commenced operation as a drug store, occupying premises owned by the Investment Company.

The articles of incorporation were executed by Hollander, Ben L. Rudderow, and Don C. Babbitt. The last two named were attorneys in the office of Frank H. Lyman, who had drawn up and dictated the articles. Mr. Lyman described Mr. Rudderow and Mr. Babbitt as "mere supernumeraries * * * for purely mechanical purposes for organizing the corporation."

The certificate of incorporation was issued by the Arizona Corporation Commission on August 12, 1931. The articles of incorporation named Dr. Craig as statutory agent.

Rudderow and Babbitt participated with Hollander in the organization meeting held on August 13, 1931. At that meeting Hollander acted as chairman and Rudderow as secretary. From the minutes of the meeting, which were signed by Hollander and Dr. Craig, it appears that a list was opened to receive subscriptions of shares of the capital stock of the corporation. The list reads in part as follows:

"Capital Stock—$100,000, Divided into One Thousand Shares of the Par Value of $100.00 Each of Which, Five Hundred Shares are Preferred Stock and Five Hundred Shares, Common Stock.

"We the undersigned, hereby severally agree to take and pay for at the price and in the manner to be fixed by the Board of Directors of said corporation, the number of shares of the Hollander Drug Co. set opposite our respective names.

"Dated this thirteenth day of August, 1931.

| Name | Addresses | Shares |
| --- | --- | --- |
| Ben L. Rudderow | Phoenix, Arizona | 1 |
| Don C. Babbitt | Phoenix, Arizona | 1 |
| Robert W. Craig | Phoenix, Arizona | 250 |

(Subject to deduction of one share subscribed for by Ben L. Rudderow for the purpose of qualifying as Director of said company.)

| | | |
| --- | --- | --- |
| E. M. Hollander | Phoenix, Arizona | 250 |

(Subject to deduction of one share subscribed for by Don C. Babbitt for the purpose of qualifying as Director of said company.)

"Robert W. Craig,      E. M. Hollander,
  "Secretary          Chairman."

The minutes show that, at the meeting of the board of directors held immediately following the organization meeting, the secretary reported that all 500 shares of the common stock had been subscribed. Rudderow thereupon resigned as director of the company, and tendered an assignment of one share of the common stock to C. T. Washburn. After Rudderow's resignation had been accepted, Hollander nominated Dr. Craig, "a holder of common stock in said company," for director. Dr. Craig was unanimously so elected. Babbitt also tendered his resignation, together with

an assignment of one share of the common stock to Washburn, who was unanimously elected director. The board of directors elected Hollander president, Washburn vice president, and Dr. Craig secretary and treasurer.

The following resolution was then adopted by unanimous vote of the directors:

"Whereas, the subscribers to all of the common capital stock of this corporation, less two qualifying shares issued to the incorporators named in the Articles of Incorporation, have invested in the promotion and organization of said corporation, substantial sums of money, relatively equal in amount, and have performed services in the promotion of said corporation, adequate as consideration for the issuance to them in equal proportion, [of] all of the common stock of said company, at its full par value.

"Now, therefore, be it resolved that in consideration of such expenditures and services, there be issued to Dr. Robert W. Craig, 250 shares of the common stock of said corporation, less one share originally issued to Ben L. Rudderow and now held by C. T. Washburn, all fully paid for, and that 250 shares of the common stock be issued to E. M. Hollander, less one share originally issued to Don C. Babbitt, and now held by C. T. Washburn, all fully paid for."

Thereupon, Dr. Craig proposed to buy 75 shares of the preferred stock at the par value of $100 and pay therefor in cash. His offer was accepted and the secretary was directed to deliver the shares to Dr. Craig. Hollander then proposed to transfer to the company a stock of drugs and fixtures at a value acceptable to the board of directors, and to take payment therefor in shares of preferred stock, at the par value of $100 each. Hollander's proposition was accepted.

In accordance with the resolution and the minutes quoted above, certificates of preferred and common stock were issued to the various shareholders. Most of those certificates were signed both by Dr. Craig, as secretary, and by Hollander, as president.

As to the consideration paid by Dr. Craig for his common stock, the Doctor himself testified as follows: "No money consideration was paid by me for the issue of 249 shares of the common capital stock in the Hollander Drug Co. There was a money consideration paid by the Central Avenue Investment Co. for this 249 shares of common stock. There was the expenses of a trip to Evansville, Indiana, of two or three hundred dollars, and the only other consideration was services rendered in the promotion of the company by a trip to Evansville, Indiana, investigating Mr. Hollander, and various conversations and such with reference to the establishment of the store. I made this investigating trip as, and in the capacity of, president of the Central Avenue Investment Co." The parties seem to be in virtual agreement that the consideration paid by Dr. Craig for his stock was grossly inadequate. Referring to the case of In re Phoenix Hardware Co. (Loug v. Christy) (C. C. A. 9) 249 F. 410, the appellee says in his brief: "Appellee especially calls the court's attention to the resemblance of that case to the case at bar. In the former, the stock was issued for merchandise at a fictitious valuation, while in the case at bar the stock was issued upon a claimed consideration of $50,000 for 'promoter's expenses'. The only actual amount paid, or claimed to be paid, in cash was a promotion expense of approximately $350."

The appellant states: "The only possible consideration for the purported issuance of common stock to R. W. Craig was the small amount of money spent by the Central Avenue Investment Company in sending respondent R. W. Craig to Evansville, Indiana, prior to incorporation of the Hollander Drug Company and such services as respondent R. W. Craig performed subsequent to incorporation in the furtherance of the business of the corporation. Counsel for the trustee below argued that this is no consideration at all. We do not concede his position but in any event the consideration was of but little value."

The master's finding on this subject, confirmed by the court below, was as follows: "* * * that no payment was ever made by R. W. Craig for the common stock issued to him * * *." The appellee did not file any exceptions to the master's report and has presented no cross-appeal.

The record shows that the par value of Dr. Craig's 249 shares was $24,900.

In his petition, the appellee averred: "That said corporation, its officers, directors, managers and agents represented to the public at all times since its organiza-

tion and the issuance of said stock as herein set out, that its capital stock to the extent of $50,000.00 for common stock and $19,000.00 for preferred stock, had been subscribed for and had been, or would be paid in full, and relying on such representations the public, and especially the creditors of said corporation extended credit to said corporation in the amount and to the extent hereinafter set forth."

The appellee also alleged:

"That at the same time there was issued to said Robert W. Craig 249 shares of the common stock of said corporation, for which he paid into the treasury of the corporation no consideration therefor other than his promise to pay for same; and there was then issued to said Robert W. Craig, a certificate for 249 shares of the common stock of said corporation as fully paid for. * * *

"That all of said shares of common stock were subscribed for by said Robert W. Craig [and others] * * * who promised to pay for same the full par value thereof, namely $100.00 per share, upon the call of the corporation or its Board of Directors, but no such payments were ever made by any of them and their subscriptions therefor remain unpaid."

At a meeting held on November 17, 1931, the board of directors of the drug company passed a resolution authorizing an assignment of all its assets for the benefit of its creditors, to William J. Lester.

The Hollander Drug Company was adjudged a bankrupt in the court below on January 12, 1932.

The proceedings below were instituted by "petition for order directing trustee to make an assessment and call upon the unpaid subscriptions to the stock of the Hollander Drug·Co., a corporation, bankrupt, for the purpose of paying its debts." An order to show cause upon the trustee's petition was issued by the referee in bankruptcy, against Hollander, Washburn, and Dr. Craig, who owned all the capital stock of the corporation. Dr. Craig filed a motion to dismiss the petition and the order to show cause. The court below made an order of reference to a special master. An amended answer to the petition and the order to show cause was later filed by Dr. Craig. The special master submitted a report, findings of fact, memorandum of points and authorities, conclusions of law, and recommendations to the court. Dr.

Craig filed exceptions to the master's report, which exceptions were disallowed and overruled by the court below, and the master's report was confirmed. After the hearing on the exceptions to the master's report, the death of Dr. Craig was suggested to the court, and by stipulation of all parties, filed August 15, 1933, the appellant was substituted as a party as successor to the decedent.

On January 20, 1934, the appellee was substituted for Joseph E. Noble, trustee, who had resigned. The decree appealed from herein was filed on January 31, 1934. The decree recites, inter alia, that Hollander is insolvent and unable to respond to an order of the court requiring the stockholders to contribute to pay the bankrupt company's debts.

The petition for appeal was filed by the appellant alone, without being joined by Hollander and Washburn, the other respondents. On February 20, 1935, the appellee filed in this court an affidavit setting forth that on March 22, 1934, he received $200, in payment for the full assessment on the two shares of the common stock issued to Washburn. On the same day, Hollander filed in this court an appearance in which he stated, under oath, that even if the appellant "had notified him of his purpose and intention to prosecute an appeal in said decree, to review the same, with a request that he join him, he would have refused so to join, and further states that he hereby waives and releases any and all error that may have been committed in the court below during the progress of the trial, and he asks this court to pass upon the merits of said appeal without any reference to any supposed rights he may ever have had in connection with the action and the record and proceedings therein."

On January 30, 1935, the appellee filed in this court a motion to dismiss the appeal or affirm the decree, on the following grounds:

1. That this court is without jurisdiction to entertain the appeal because all the parties interested in the decree have not joined in such appeal, "nor has there been any severance or notification to them to appear in this court, nor is there anything in the record to show that they have refused to join in the appeal."

2. That this court is without jurisdiction also for the reason that the decree appealed

from is not within the purview of those "bankruptcy proceedings" from which an appeal may be taken as a matter of right; that allowance of an appeal therefrom was within the discretionary power of this court under section 24b of the Bankruptcy Act as amended by Act May 27, 1926. 11 USCA § 47 (b); and that a proper petition for allowance of the appeal and a sufficient record in connection therewith were not filed herein.

■ As to the first point, it should be observed that the rule requiring a summons and severance in such cases applies only to joint judgments or decrees. In Winters v. United States, 207 U. S. 564, 574, 575, 28 S. Ct. 207, 210, 52 L. Ed. 340, the court said: "The rule which requires the parties to a judgment or decree to join in an appeal or writ of error, or be detached from the right by some proper proceeding, or by their renunciation, is firmly established. But the rule only applies to joint judgments or decrees. In other words, when the interest of a defendant is separate from that of other defendants he may appeal without them." See, also, Beardsley v. Ark. & Louisiana Railway Co., 158 U. S. 123, 127, 15 S. Ct. 786, 39 L. Ed. 919; Hardee v. Wilson, 146 U. S. 179, 180, 13 S. Ct. 39, 36 L. Ed. 933; Pflueger v. Sherman, 293 U. S. 55, 57, 55 S. Ct. 10, 79 L. Ed. 193; Pflueger v. Sherman (C. C. A. 9) 75 F.(2d) 84, 88; Alsop v. Conway (C. C. A. 6) 188 F. 568, 572, certiorari denied 223 U. S. 720, 32 S. Ct. 523, 56 L. Ed. 629; Hightower v. American National Bank (C. C. A. 5) 276 F. 371, 374, affirmed 263 U. S. 351, 44 S. Ct. 123, 68 L. Ed. 334.

■ The law is well established that the liability of a stockholder is several and not joint. In Long v. Christy, supra, 249 F. 410, at page 414, this court said: "An objection is made to the decree that it is joint and several against all the stockholders. The order and decree of the referee in bankruptcy was several only, and the District Court by its decree rendered the liability joint and several against all. In this the court was in error. 'The liability of a subscriber for the capital stock of a company is several, and not joint.' [Cases cited.]" See, also, Hightower v. American Nat. Bank, supra, 276 F. 371, at page 374.

On the second proposition relied upon by the appellee in his motion to dismiss, the applicable statutes are as follows:

"(a) The Supreme Court of the United States, the circuit courts of appeal of the United States, the Court of Appeals of the District of Columbia, and the supreme courts of the Territories, in vacation, in chambers and during their respective terms, are invested with appellate jurisdiction of controversies arising in bankruptcy proceedings from the courts of bankruptcy from which they have appellate jurisdiction in other cases.

"(b) The several circuit courts of appeal and the Court of Appeals of the District of Columbia shall have jurisdiction in equity, either interlocutory or final, to superintend and revise in matter of law (and in matter of law and fact the matters specified in section 48 of this title) the proceedings of the several inferior courts of bankruptcy within their jurisdiction. Such power shall be exercised by appeal and in the form and manner of an appeal, except in the cases mentioned in said section 48 of this title to be allowed in the discretion of the appellate court.

"(c) All appeals under this section shall be taken within thirty days after the judgment, or order, or other matter complained of, has been rendered or entered." 11 USCA § 47.

"(a) Appeals, as in equity cases, may be taken in bankruptcy proceedings from the courts of bankruptcy to the circuit courts of appeal of the United States and the Court of Appeals of the District of Columbia and to the supreme courts of the Territories in the following cases, to wit: (1) From a judgment adjudging or refusing to adjudge the defendant a bankrupt; (2) From a judgment granting or denying a discharge; and (3) From a judgment allowing or rejecting a debt or claim of $500 or over. Such appeal shall be taken within thirty days after the judgment appealed from has been rendered, and may be heard and determined by the appellate court in term or vacation, as the case may be. * * *" 11 USCA § 48.

■ The foregoing provisions of the Bankruptcy Act have repeatedly been construed as meaning that if the matter in dispute is a "controversy arising in bankruptcy," it is appealable from the District Court as a matter of right; whereas, if it is a "proceeding in bankruptcy," it may, save in the three instances specifically excepted in the statute itself, be appealed only by permission of the Circuit Court of Appeals.

A recent exposition of the rule is to be found in Handlan v. Bennett (C. C. A. 4) 51 F.(2d) 21, 23:

"Under section 24a of the Bankruptcy Act, 11 USCA § 47 (a), a controversy arising in bankruptcy is reviewable on appeal by the appellate courts and such an appeal does not have to be allowed by the appellate court. It was held in the case of Taylor v. Voss, 271 U. S. [176] 180, 46 S. Ct. 461, 463, 70 L. Ed. 889, that: ' "Controversies arising in bankruptcy proceedings" referred to in section 24a, include those matters arising in the course of a bankruptcy proceeding, which are not mere steps in the ordinary administration of the bankrupt estate, but present, by intervention or otherwise, distinct and separable issues between the trustee and adverse claimants concerning the right and title to the bankrupt's estate.' Under this definition, the matter in dispute in this case is undoubtedly a 'controversy arising in bankruptcy proceedings' as distinguished from 'the proceedings' of a court of bankruptcy, and is, therefore, appealable as a matter of right, under section 24a of the act.

" 'Proceedings' in bankruptcy referred to in section 24b, 11 USCA § 47 (b) has been defined by the Supreme Court in the case of Taylor v. Voss, supra, as 'those matters of an administrative character, including questions between the bankrupt and his creditors, which are presented in the ordinary course of the administration of the bankrupt's estate.' An appeal involving 'proceedings' in bankruptcy must be allowed by the Circuit Court of Appeals unless it relates to one of the three matters specified in section 25 (11 USCA § 48), viz., a judgment adjudging or refusing to adjudge bankrupt, from a judgment granting or denying a discharge from debts, and from a judgment allowing or rejecting a debt or claim of $500 or over, any of which questions may be appealed without the allowance of the appellate court. [Cases cited.]"

See, also, Thompson v. Mauzy (C. C. A. 4) 174 F. 611, 614; Morehouse v. Pacific Hardware & Steel Co. (C. C. A. 9) 177 F. 337, 339, 340; In re Breyer Printing Co. (C. C. A. 7) 216 F. 878, 880, 881, certiorari denied 235 U. S. 701, 35 S. Ct. 203, 59 L. Ed. 432; In re Prudential Lithograph Co. (C. C. A. 2) 270 F. 469, 471, certiorari denied 256 U. S. 692, 41 S. Ct. 534, 65 L. Ed. 1174; Quinn v. Gardner (C. C. A. 8) 28 F.(2d) 270, 271, 272; In re Miller &

Harbaugh (C. C. A. 9) 56 F.(2d) 141, 142, and cases there cited.

Applying the definitions contained in the foregoing decisions, we have no difficulty in classifying the instant case as a "controversy" in bankruptcy, "arising between the trustee representing the bankrupt and his creditors, on the one side, and adverse claimants on the other, affecting the extent of the estate to be distributed." Taylor v. Voss, supra, 271 U. S. 176, at page 181, 46 S. Ct. 461, 464, 70 L. Ed. 889.

Being a "controversy" and not a "proceeding," the instant case may be appealed without the permission of this court.

Accordingly, the motion to dismiss the appeal or to affirm the decree is denied.

We advance, then, to a consideration of the case on the merits.

The appellant filed 56 assignments of error, and in his brief he relies upon 33 specifications. Our determination of the question presented by the assignments dealing with the invalidity of the stock issued to Dr. Craig, however, renders it unnecessary for us to consider the other points raised by the appellant. The illegality of the issue of stock to Dr. Craig was also urged by the appellant's exceptions to the master's report.

In his brief, the appellant relies upon various grounds for the invalidity of the stock issue, so far as Dr. Craig is concerned. It is here necessary, however, to discuss only the proposition that "the common stock purporting to have been issued to respondent R. W. Craig was void under section 6 of article 14 of the Constitution of the State of Arizona."

The section in question reads as follows: "No corporation shall issue stock, except to bona fide subscribers therefor or their assignees; nor shall any corporation issue any bond, or other obligation, for the payment of money, except for money or property received or for labor done. The stock of corporations shall not be increased, * * * nor shall any law authorize the increase of stocks of any corporation without the consent of the person or persons holding the larger amount in value of the stock of such corporations, nor without due notice of the proposed increase having been given as may be prescribed by law. All fictitious increase of stock or indebtedness shall be void."

The Supreme Court of Arizona has repeatedly declared the foregoing provision "to be a declaration of public policy."

Referring to the case of Ettlinger v. Collins, 25 Ariz. 115, 213 P. 1002, the State Supreme Court, in Overlock v. Jerome-Portland Copper Min. Co., 29 Ariz. 560, 565, 243 P. 400, 401, said:

"We then quoted section 6, art. 14 of the state Constitution, and commented as follows:

"'Similar constitutional or statutory provisions may be found in the states of Pennsylvania, Oklahoma, Illinois, California, Nebraska, Kentucky, Alabama, Arkansas, Missouri, Texas, Louisiana, Colorado, South Dakota, Ohio, New York, Wisconsin, Maine, Utah, Indiana, Mississippi, New Jersey, Tennessee, Washington, Oregon, Massachusetts, and Iowa. These constitutional and statutory provisions invariably end with the statement, "All fictitious increase of stock shall be void," and in the states which have these provisions, it has been uniformly held that stock issued in violation of them is null and void. The provisions seem to be a declaration of public policy, and the decisions are to the effect that any act done in violation of the public policy of the state is null and void.'

"The writer of the syllabi construes the opinion on that point as follows:

"'Under Constitution, art. 14, § 6, prohibiting issuance of stock by a corporation, except for money or property received, or for labor done, and making all fictitious increase of stock or indebtedness void, the issuance of stock by a corporation for which no sufficient consideration has been paid is contrary to public policy, and the stock so issued is void.'

"And we believe this headnote correctly states the point decided."

From the foregoing, it will be seen that "the issuance of stock by a corporation for which no sufficient consideration has been paid is contrary to public policy, and the stock so issued is void." It can hardly be argued that the payment of $350, at most, for stock having a par value of $24,900, constitutes a "sufficient" consideration. Indeed, the master specifically found that "no payment was ever made by R. W. Craig for the common stock issued to him." The appellee did not complain of such finding, which was, in fact, in accord with the appellee's own allegation that "there was issued to said Robert W. Craig 249 shares

of the common stock of said corporation, for which he paid into the treasury of the corporation no consideration * * * other than his promise to pay for the same."

If there be any doubt, however, as to what the Supreme Court of Arizona regards as a "sufficient" consideration for corporate stock, that doubt is dispelled by the following language used by that tribunal on page 564 of 29 Ariz., 243 P. 400, 401, of the Overlock opinion, supra: "The evident purpose of the clause, which says, 'No corporation shall issue stock, except to bona fide subscribers therefor or their assignees,' was to prevent the issuance of stock except to parties who paid for it at its face value, and was intended more for the protection of creditors of the corporation than otherwise."

It may be argued that the last clause of the foregoing excerpt from the Overlock opinion indicates that the Supreme Court of Arizona would not regard the issuance of stock for little or no consideration as void in a suit for assessment and call brought against a stockholder by a trustee in bankruptcy, as representative of all the creditors.

This view, however, cannot be maintained in the face of a recent decision of the same Supreme Court, in the case of National Union Indemnity Co. v. Bruce Bros., Inc., 38 P.(2d) 648, 651, 652, 653, 654. The court there was construing section 657 of the Revised Code of Arizona, which provides that any foreign corporation before entering upon any business in Arizona shall do certain things, and section 658, which reads as follows: "No foreign corporation shall transact any business in this state until it has complied with the requirements of the preceding section, and every act done by said corporation prior or thereto shall be void."

Suit was brought by a foreign corporation, which had contracted with the state of Arizona to furnish all the labor and materials for the construction of a part of a state highway, against a materialman and his surety. It was admitted that the foreign corporation had not complied with the provisions of section 657, before entering into the contract with the state. The question presented for decision was whether or not such noncompliance rendered the bond sued on void, precluding the plaintiff corporation from maintaining its suit either against the materialman or his surety. A

verdict had been returned for the plaintiff, and judgment had been rendered thereon.

On the question of the invalidity of the bond as a result of the plaintiff's noncompliance with section 657, the Supreme Court of Arizona said:

"If nothing further appears, plaintiff may not maintain this action, for by the express language of the statute its contract is void. A void contract is one which never had any legal existence or effect, and it cannot in any manner have life breathed into it. Where the statute, in substance, gives an option to one party or another to declare a contract void, it is frequently held the right may be waived in one manner or another because the contract in reality is not void, but merely voidable, no matter which word is used in the statute. [Cases cited.] But under a statute such as ours, there is no room for construction. The Legislature has repeatedly and solemnly declared that any and all the acts of the corporation are 'void,' without qualification or exception of any nature. Under such circumstances, no action that any one could take could give the contract validity. [Case cited.] Unless, therefore, plaintiff can show that for some reason the statute does not apply to contracts made under the circumstances of the one involved in the present case, its suit must fall. * * *

"The remaining contentions of plaintiff upon this point are in substance determined by the answer to the question of whether or not any or all of the parties to a void contract may waive its illegality and allow the court to proceed to enforce it. It is, of course, true that where a contract is not illegal on its face, and the facts which make it illegal do not appear in the pleadings or the evidence, the court will enforce the contract. [Cases cited.] But it is practically universally held that a party to an illegal contract cannot, either at the time of the execution of the contract or afterwards, waive his right to set up the defense of illegality in any action thereon by the other party. As was said in Hall v. Coppell, 7 Wall. (74 U. S.) 542, 558, 19 L. Ed. 244:

"'* * * In such cases there can be no waiver. The defense is allowed, not for the sake of the defendant, but of the law itself. The principle is indispensable to the purity of its administration. It will not enforce what it has forbidden and denounced. The maxim, ex dolo malo non oritur actio, is limited by no such qualification. The proposition to the contrary strikes us as hardly worthy of serious refutation. Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection, would be tainted with the vice of the original contract, and void for the same reasons. Wherever the contamination reaches, it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation. [Cases cited.]' * * *

"Nor can a contract against public policy be made valid even by ratification. [Cases cited.] The only exception to the general rule is that an account or contract which has been declared voidable only, for the protection or benefit of a certain party or class of parties, may be ratified unless such ratification is in contravention of public policy. [Case cited.] Were this contract one of the class which is voidable merely at the option of one of the parties, the defense of illegality could, of course, be waived. [Case cited.] But as we have pointed out, such is not the situation. Whatever the motive which induced the Legislature to pass the section in question, it has made it applicable to all cases without exception. It has not merely, as in the case of the statutes of limitations, taken away the remedy but has denied the right. It has declared the contract void ab initio. This can be considered nothing but an expression of public policy upon the part of the state, and neither the court nor any litigant has the right to waive the provisions of the act. It is the duty of the court, whenever the facts which render the contract void are called to its attention, to declare the law, and no party may recover in an action where the right of recovery must rest in some manner upon the void contract. It is contended that because Scott, the principal on the bond, has not legally raised the issue, the surety is not permitted to do so. We have been cited to no case, and we are satisfied that none can be found, holding that when a contract which is void ab initio as a matter of public policy, is declared on, that any party whom it is sought to bind under the contract is barred from raising the objection. It has been repeatedly held that statutes of this nature are constitutional, and when such is the case, the courts have no

option but to enforce the law as it is written."

If it be argued that the Supreme Court of Arizona would not have thus ruled if the plaintiff in the Bruce Bros. Case, supra, had been a creditor, on the ground that such ruling would have entailed hardship on an innocent party, the answer is that the Supreme Court was well aware of the full implications of the doctrine which it was announcing. The opinion continues:

"We have realized the harshness of the law and the fact that in individual cases its application may work grievous injustice, and wherever there was a doubt as to its applicability, have resolved that doubt in favor of the validity of the contract objected to, but where the facts show, beyond a doubt, that the contract falls within the statute, the question of abstract justice or the effect of the law is not for us. The Legislature has acted within its constitutional authority, and the facts are clear. It appearing from the record that the contract on which plaintiff seeks to recover was by the public policy of this state declared to be void, no recovery can be had thereon as against any person. It is useless for us to consider any of the other questions raised on this appeal.

"The judgment of the superior court of Maricopa county is reversed and the case remanded with instructions to enter judgment in favor of the defendant."

The Supreme Court of Arizona reiterated its adherence to the foregoing principles in the companion case of Scott v. Bruce Bros., Inc., 38 P.(2d) 654, 655.

The decisions in the Bruce Bros. Cases make it clear that the Supreme Court of Arizona has adopted the "blank piece of paper" doctrine in force in California and in other jurisdictions. In Black v. Solano Co., 114 Cal. App. 170, 176, 299 P. 843, 846, the court said: "If plaintiff bought a security, within the meaning of the [corporate securities] act, and it was issued without a permit, if required by the act, the eyes of the law see it as a blank piece of paper, giving plaintiff no right to any oil."

The precise question that confronts us here was decided by the Supreme Court of California, in Kellerman v. Maier, 116 Cal. 416, 48 P. 377, 379. In that case, the court said: "It appears that certain stockholders had purchased and paid for stock at 50 cents per share, and that by the resolution of October 6th the price was reduced to 25 cents per share, and additional shares were to be issued to those who had purchased at 50 cents, in order to equalize the prices, so that the stock already purchased should cost no more than that to be purchased at the reduced price. Section 359 of the Civil Code provides: 'No corporation shall issue stock or bonds except for money paid, labor done, or property actually received.' The certificates for the 2,000 shares of stock referred to appear to have been issued in violation of this provision; and, if they were so issued, they were void, and the parties receiving them did not thereby become shareholders, nor make themselves liable to creditors as for an unpaid subscription. [Cases cited.]"

In Fletcher Cyclopedia Corporations, infra, the following language is used: "Stock issued without authority and in violation of law is void, and confers no rights on the person to whom it is issued and subjects him to no liabilities."

The Supreme Court of California has thus phrased the rule: "But the doctrine of estoppel by conduct or by laches, or even ratification, has no application to a contract or instrument which is void because it violates an express mandate of the law or the dictates of public policy. Such a contract has no existence whatever. It has no legal entity for any purpose, and neither action nor inaction of a party to it can validate it; and no conduct of a party to it can be invoked as an estoppel against asserting its invalidity." Colby v. Title Ins. & Trust Co., 160 Cal. 632, 644, 117 P. 913, 918, 35 L. R. A. (N. S.) 813, Ann. Cas. 1913A, 515.

See, also, Scovill v. Thayer, 105 U. S. 143, 148, 149, 26 L. Ed. 968; Herkner v. Rubin, 126 Cal. App. 677, 681, 14 P.(2d) 1043; Cecil B. De Mille Productions v. Woolery (C. C. A. 9), 61 F.(2d) 45, 48-49; Fletcher Cyclopedia Corporations, vol. 5, § 3486, pp. 5765-5768.

In this discussion, we have so far assumed that the appellee has regarded the issue of stock to Dr. Craig as being valid, so far as the appellee's rights are concerned. That would seem to be the appellee's position, as disclosed in his pleadings and elsewhere in the record. For instance, in his petition the appellee avers: "That there remains due and unpaid upon the subscriptions to the common stock of said bankrupt

corporation the sum of $50,000.00 by the subscribers thereto, namely, the said Robert W. Craig," etc.

The master found: "That an assessment is necessary to pay the debts of the corporation and the expense of the administration. That the amount which should be levied is 100% on the par value of the common stock held by R. W. Craig and Carl T. Washburn."

The appellant filed no fewer than five exceptions to the master's report "on the ground that the evidence proves that no common or preferred stock was legally issued to R. W. Craig." Each of these exceptions was specifically overruled by the court below, which in its decree ordered an assessment "upon the common stock of said bankrupt corporation." It would seem an anomaly for a court to order an assessment on corporate stock unless it believed that such stock was, for some purposes at least, valid. Indeed, the entire record compels the conclusion that the court did so regard the stock. From his brief, it is evident that the appellee still so regards it; for, quoting from the Overlock Case, supra, which, however, does not support his view, he says: "From the above it is clear that the Supreme Court of Arizona does not regard stock issued and not fully paid for as absolutely void, but only voidable at the instance of creditors, thus bringing the position of Arizona into harmony with that of her sister states."

The Overlock Case specifically holds that stock so issued is void.

If, however, despite his prayer for "an assessment and call upon the stock of said bankrupt corporation of one hundred per cent * * * of the par value of the common stock," the action brought by the appellee is one sounding in tort, he encounters the other horn of the dilemma; for, in a creditor's tort action, it must be shown that the particular creditor suing was defrauded by misrepresentation of the actual capital of the corporation.

In Scovill v. Thayer, supra, 105 U. S. 143, at page 151, 26 L. Ed. 968, the court said: "As forcibly suggested by counsel, a creditor, who has been defrauded by misrepresentation of the real capital of the company, has his remedy in an action of tort against all who participated in the fraud. But the wrong done to him cannot entitle the entire body of creditors, who have not suffered from the alleged fraud, to recover of the entire body of stockholders, who have taken no part in it."

This doctrine has been recognized in a number of decisions by courts of the various states. One of the most elaborate expositions of the principle is to be found in Spencer v. Anderson, 193 Cal. 1, 6, 222 P. 355, 357, 35 A. L. R. 822. There the court said: "The creditor's bill against the holder of watered stock, on the other hand (i. e., one who has received stock from the corporation and paid therefor ostensibly in full, but in property at a fraudulently excessive valuation), proceeds upon entirely different principles. Here, though the creditor's claim against the corporation may rest in contract, his claim as against the stockholder rests in tort. The gist of his action against the latter is the fraud and deceit of the corporation in falsely representing its corporate capital to have been paid in full when it was not. [Cases cited.] In this action the creditor does not stand in the shoes of the corporation and he is not suing to recover upon a claim of the corporation against the stockholder. He may recover, though the corporation have no such claim. His action is not upon a debt due from the stockholder to the corporation. It is to recover compensation for a wrong done directly to him by the corporation acting for the stockholder and participated in by the latter. The gist of the creditor's action is that he was induced to extend credit to the corporation by the false representations of the corporation respecting the amount paid in by the stockholder to the corporate capital, and the measure of his recovery is the same as in ordinary actions for damages for deceit, namely, the difference between the amount which has actually been paid in by the stockholder to the corporate capital and the amount which would have been paid in had the representations been true. It follows that the creditor cannot recover in this class of cases unless he was actually deceived by the misrepresentations. If he in fact knew that the stock was watered at the time he extended credit to the corporation, he cannot claim to have been misled by the misrepresentations, and therefore cannot recover. [Cases cited.]"

See, also, Rhode v. Dock-Hop Co., 184 Cal. 367, 376–382, 194 P. 11, 12 A. L. R. 437; Sherman v. S. K. D. Oil Co., 185 Cal. 534, 546, 197 P. 799; Colville Valley Coal Co. v. Rogers, 123 Wash. 360, 212 P. 732, 735; Gray Const. Co. v. Fantle (S. D.)

253 N. W. 464, 470 (on the distinction between an action alleging watered or fictitiously issued stock and one based upon an unpaid stock subscription).

It is true that the appellee's petition alleges that the corporation and its agents represented to the public that the common stock of the company was $50,000 and the preferred stock $19,000 and "relying on such representations the public, and especially the creditors of said corporation extended credit to said corporation," etc.

■ But the appellee wholly failed to prove that any creditor relied upon the company's representations concerning its capital stock. Indeed, there is in the record considerable affirmative evidence that several of the creditors did not even know that the Hollander Drug Company was a corporation, and that by far the largest creditor knew the facts concerning Dr. Craig's payment for his stock. And it must be borne in mind that, according to the admonition of the Supreme Court of the United States, even if it should be proved that there has been a wrong done to a creditor "who has been defrauded by the misrepresentation of the real capital of the company," such "wrong done to him cannot entitle the entire body of creditors, who have not suffered from the alleged fraud, to recover of the entire body of stockholders, who have taken no part in it." The trustee in bankruptcy, of course, represents *all* the creditors, and cannot bring a fraud action on behalf of only a fraction of them.

In 1 Loveland on Bankruptcy, § 356, p. 734 (4th Ed.), the rule is thus stated: "A trustee in bankruptcy represents the general or unsecured creditors, and his duties relate generally to their interests. He represents creditors of the bankrupt at the time the petition is filed and not prior creditors. He represents all of the unsecured creditors and not any class or group of them. The court will not permit him to be governed by any creditor or group of creditors, but will direct him to report at a meeting of all the creditors and be governed by them."

See, also, Atkins v. Wilcox (C. C. A. 5) 105 F. 595, 597, 53 L. R. A. 118; In re Doran (D. C.) 148 F. 327, 330; Stephenson v. Bird, 168 Ala. 363, 53 So. 92, 93, 94, Ann. Cas. 1912B, 249.

The Brunswig Drug Company, of Los Angeles, Cal., was the largest single creditor of the Hollander Drug Company, by several thousand dollars. W. C. McCormick was state representative of the Brunswig Company in Arizona. There is uncontradicted testimony in the record that Dr. Craig, Mr. McCormick, and Walter Brawner, of Phœnix, discussed "what the corporate set-up was to be and what consideration was to be paid to Hollander Drug Company," and the fact that Dr. Craig and Hollander "were to pay nothing for the common stock."

The owner of the New State Electric Company, one of the next largest creditors, did not know that the Hollander Company was a corporation when he started to do business with it, was not sure that he had ever known that it was a corporation, and did not know what was its authorized or issued capital stock.

C. C. Jones, another creditor, testified that he did not know that the Hollander concern was a corporation.

Similar testimony was given by executives of the Southwestern Sash & Door Company, the third largest creditor; the Donofrio Floral Company; and Manufacturing Stationers, also creditors of the Hollander Company.

Assuredly, as to all those creditors, any statements in the company's articles of incorporation did not amount either to actual or constructive fraud.

■ Accordingly, we hold that no action ex contractu can be maintained against the purported stockholders of the Hollander Drug Company, in the form of an assessment and call based upon the attempted issue of shares to them, for the reason that, at least as far as Dr. Craig was concerned, such issue was in direct contravention to the Constitution of Arizona and therefore was "a blank piece of paper," "for all purposes," "as against any person."

■ We further hold that, if the trustee's petition for an assessment and call on Dr. Craig's stock could be tortured into an action ex delicto, it could not be maintained, for the reason that a trustee in bankruptcy represents all the creditors, and not a part of them. The uncontroverted evidence shows that no fraud or deceit was practiced on several of the creditors at least, since they either knew the facts or did not at all rely upon the corporate character of the Hollander Company. No actual fraud was proved as to any creditor whatsoever.

**Decree reversed.**