**WESTERN AIRLINES, INC., Appellant,**

v.

**The LATHROP COMPANY et al., Appellees.**

No. 1404.

Supreme Court of Alaska.

July 28, 1972.

—◆—

Stephen C. Cowper, Fairbanks, C. R. Kennelly, J. H. Shortell, Jr., Anchorage, for appellants.

W. C. Arnold, Dorothy Awes Haaland, Asst. Atty. Gen., Anchorage, John E. Havelock, Atty. Gen., Juneau, John W. Pletcher III, Asst. Atty. Gen., Anchorage, for appellees.

Before BONEY, C. J., and RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

RABINOWITZ, Justice.

Western Airlines, Inc., has appealed from an adverse judgment in the superior court finding Western liable to the Lathrop Company for breach of a lease agreement. As the circumstances leading up to this litigation are complex, our review requires a rather detailed analysis of the facts.[1]

On October 1, 1953, the United States Government leased certain unimproved lands at the Anchorage International Airport to Pacific Northern Airlines, Inc.[2] In its relevant parts, the lease provided for a term of 10 years and gave PNA the option to renew the lease for an additional 10-year term "by serving written notice on the Government of the election of the Tenant so to do on or prior to September 1, 1963." The lease further granted to PNA the right to construct a building on the premises. In the event the lease was terminated by either party prior to expiration, the lease permitted the government to require removal of any buildings within 60 days after termination. Although the lease listed several occurrences which would operate as a termination of the lease, no provision was made for the possibility of a governmental taking of the leasehold interest except that the government reserved the right to terminate "in the event that the premises shall be required for the use of the United States in the interests of National Defense." The lease further provided that PNA would not assign the lease without prior approval of the government.[3]

On June 27, 1959, the federal government transferred the ownership of Anchorage International Airport, including the property here in question, to the State of Alaska. The state assumed the federal government's obligations under the PNA lease.

On December 24, 1959, PNA wrote to Tony Schwamm, then Director of the Division of Air Terminals,[4] requesting to "exercise our option to renew" the 1953 lease, to have an extension of three years beyond the renewal period, and to be allowed to assign the lease to acceptable parties. Before receiving any response to these requests, on December 30, 1959, PNA and Hill's, Inc. executed an agreement under which PNA sold its building at Anchorage International Airport to Hill's, Inc., simultaneously assigned to Hill's all of its rights under the 1953 lease and the 1955 supplement agreement, and leased back from Hill's the building and the premises.

Under the terms of this agreement, PNA agreed to lease six airport facilities in various Alaska communities,[5] including the premises at Anchorage International Airport, until December 31, 1974, a term of 15 years. Hill's agreed to purchase from PNA the building that had been constructed on

---

1. At the outset it should be noted that Western became the successor in interest to Pacific Northern Airlines, Inc., and that the Lathrop Company became the successor in interest to Hill's, Inc.

2. Hereinafter referred to as "PNA."

3. In September 1955, the parties executed a supplemental agreement whereby additional land was leased to PNA. This agreement was designated as an amendment to the 1953 lease.

4. At that time, the Division of Air Terminals was a division of the Department of Public Works.

5. The assignment-leaseback also covered airport facilities at the Homer, Kenai, King Salmon, Annette Island and Cordova airports.

the premises [6] at Anchorage International Airport. The lease was conditioned upon the "lessor [Hill's] obtaining ground leases from the . . . State of Alaska for the said premises, upon the same terms and conditions as heretofore existed on the said ground leases." The lease also provided that PNA

shall faithfully perform each and every requirement of the said ground leases and as imposed by any extensions, amendments, renewals or modifications thereof . . . .

The agreement contained two provisions defining the rights and obligations of the parties in the event of governmental action respecting the property. The first provision provided:

If, during the term of this lease, the said governmental agency or agencies should require the relocation or a change in the existing structure or buildings said relocation and/or change of the said existing structures shall be made by Lessee [PNA] at its sole cost and expense.

The second provision read:

In the event that any building or facility covered hereby shall be taken by eminent domain proceedings, or by the action of any city or public authority, then this lease for such building or facility shall be terminated . . . . The Lessor [Hill's] shall look to such condemnation proceedings for compensation for the loss of the buildings and such compensation or damages shall belong solely to Lessor.

On January 4, 1960, several days after the execution of the assignment and sublease agreement between Hill's and PNA, the state replied to PNA's letter of December 24, 1959. The state's reply was as follows:

Your request dated December 28th [sic] has been considered, and the follow-

ing amendments to your lease . . . are hereby granted:

1. Option to renew for ten (10) years from October 1, 1963 to September 30, 1973 is accepted.

2. Extension of the lease for a period of three (3) years to September 30, 1976 is granted.

In accordance with the foregoing, your said lease of the premises shall expire September 30, 1976.

Although this letter shall be sufficient evidence of your notification of the above, formal documents will be forwarded to your office within a short time in order that the officers of Pacific Northern Airlines may execute the same, together with the undersigned, to complete this matter. However, if the present airport improvement program necessitates the moving of your building, a suitable area acceptable to the airport management and Pacific Northern Airlines will be provided.

Please return a copy of this letter to this office after it has been signed by an authorized officer of Pacific Northern Airlines in the space provided below.

At the bottom of the letter, in the space provided, Felix Aubuchon signed on behalf of PNA under the words, "Accepted this 4 day of January, 1960." No formal documents were ever forwarded to PNA and none were ever executed by the parties.[7]

On February 4, 1960, Hill's and PNA executed another agreement, assigning to Hill's the 1953 lease from January 1, 1960, through September 30, 1976. A consent to this agreement was signed by the Director of Air Terminals for the State of Alaska.

In 1967 it became apparent that the state would require the land occupied by PNA for expansion of the Anchorage International Airport facilities. PNA met with the state on July 6, 1967, to discuss the disposition of the existing building on the

---

6. The agreement provided, "No rent shall be charged against Lessee until Lessor has made full payment for the leasehold improvements."

7. Through an establishment-preclusion order, Western was not allowed to produce any evidence at trial that the Lathrop Company had knowledge of the letter of January 4, 1960, prior to November 1967.

**1016**

leased premises. On July 7, 1967, David Harman, Director of the Division of Aviation, informed PNA by letter that the state would require acquisition of the property by May 1968. There is no indication that the Lathrop Company (into which Hill's had merged) received a copy of this letter or participated in the July 6, 1967, meeting. On September 11, 1967, the state wrote to the Lathrop Company indicating that the state would require possession of the property by May 1968. The letter went on to state

> [u]nder the terms of our current lease agreement, upon termination of your present lease we are to provide you with a suitable replacement site for your building.

On October 27, 1967, Lathrop appointed Western Airlines (which had by this time acquired PNA by merger) to act as its agent "in any location that we have a common lease." On December 27, 1967, the state wrote to Western outlining its position that negotiations for a new site for the building were pursuant to the letter of January 4, 1960, which served as an amendment to the 1953 lease.[8] The letter also stated:

> It is necessary that we have in the near future, formal acknowledgement that you will remove your existing operations building to provide for our terminal expansion project. We have recommended that you be provided a replacement area for your operations in accordance with your application for lease of Lot 7 of Block 4.

On January 3, 1968, Western forwarded a copy of the state's letter of December 27 to Lathrop and indicated that it wished to terminate its agency relationship with Lathrop.

On March 8, 1968, Western and the state entered into a lease for a tract of land at the airport.[8a] It is not clear from this lease whether the tract was Lot 7 of Block 4, which Western had apparently applied for on behalf of Lathrop, or Lot 5 of Block 3, which Western had applied for independently in September of 1967 "for the construction of Cargo, Maintenance, Operations, and related facilities."

On March 28, 1968, the state requested that Lathrop acknowledge that the building would be removed by May 15, 1968. This letter also mentioned that Western "has now received the lease for a new tract of land that was applied for." It is not clear from this letter or from anything else in the record whether the state referred to the March 8, 1968, lease or to its recommendation that Lot 7 of Block 4 be provided as the replacement area for the building.

On April 23, 1968, Western wrote to the state expressing its belief that Western had no further responsibility under the original lease or the assignment and sublease with Lathrop, except possibly the responsibility to move the building. On May 17, 1968, the state notified Lathrop that the building must be removed by May 21 or the state, through a contractor, would do it. Western informed Lathrop on May 20 that it regarded their lease terminated with respect to the Anchorage property because of the state's "order to vacate."

On May 21, 1968, Lathrop filed suit in the superior court, seeking and obtaining a temporary restraining order preventing the state, its contractor, or Western from removing or demolishing the building in question. On May 31, 1968, the restraining order was dissolved on the state's motion. The superior court ordered Lathrop and the state to "confer immediately and agree upon a site for the removal of the building." Western was ordered to move the building; in the event it did not begin to do so by

8. The state maintains that this letter gave the state the right to terminate the existing lease without resorting to eminent domain proceedings and required PNA (and Lathrop as successor to PNA's assignee to accept as compensation a lease on replacement property).

8a. The lease was not signed by Western until May 20 nor by the state until May 23, 1968.

June 7, the state was authorized to remove it at Western's expense.[9]

Pursuant to the court's order, the state offered Lathrop Lots 10 and 11 of Block 5 as a replacement site. Lathrop notified Western of the negotiations with the state and invited Western to participate. Western did not participate in the negotiations. On June 3, 1968, Lathrop and the state agreed to enter into a lease of Lots 10 and 11 of Block 5.[10] The building was moved to this location in July by a construction company hired by the state. The building was damaged in moving, was placed on the new site without foundations or utilities connections, and was generally uninhabitable. Western continued to pay rental under its sublease with Lathrop until August 1968, but made no rental payments thereafter. Sometime before the trial of this case, the building was sold by agreement of all parties and removed to a site away from the airport.

In November 1968, Lathrop filed an amended complaint against Western and the state seeking damages from Western for breach of its lease agreement with Lathrop.[11] Lathrop sought damages from Western for accrued rentals on the property from August 1968; for future rentals for the balance of the lease term; for damage to the building; and for the additional rent required under the terms of the June 12, 1968, lease of Lots 10 and 11 of Block 5. Lathrop's complaint also alleged that Western negotiated with the state for Lot 7 of Block 4 on behalf of Lathrop and then induced the state to lease this tract directly to Western.[11a] Lathrop asked the court to declare that lot to be held by Western in trust for Lathrop if Lathrop were not otherwise compensated.

The state's position throughout the proceeding was that it did not owe the Lathrop Company any compensation for taking possession of the premises leased under the 1953 lease because the letter of January 4, 1960, "accepted" by Felix Aubuchon on behalf of PNA, constituted an amendment to the 1953 lease and obligated PNA to continue the terms of the original lease on substituted land. Western contended that the state's actions in taking possession of the premises were pursuant to its eminent domain powers and that under the provisions of its sublease with Lathrop, that sublease terminated if the facility were "taken by eminent domain proceedings, or by the action of any city or public authority."

The superior court found in favor of Lathrop. Among other things, the superior court found that Western's sublease agreement with Lathrop anticipated that the state would require relocation of the building; that Western had breached its agreement with Lathrop by refusing to assist in the selection of a replacement site and by terminating its agency authority; that Western had selected Lot 7 of Block 4 under apparent authority from Lathrop and had then used this land for its own benefit. Implicit in these findings was the conclusion that the 1953 lease had been amended by the January 4, 1960, letter. The court further found that Western's allegation of condemnation was not well founded.

As damages for the above breaches, the superior court found that Lathrop was en-

9. Western's local counsel was not notified of the May 31 hearing. He moved at a later hearing that the order be rescinded. The court, with the concurrence of all parties, verbally modified its order to the effect that the state temporarily bear the cost of moving the building with the ultimate determination of the question postponed uptil a full hearing on the merits of the case could be had.

10. A formal lease agreement dated June 12, 1968, was executed by the state and Lathrop in July 1968.

11. Lathrop did not seek any affirmative relief from the state, but apparently joined the state as a party because of its interest in the property and its participation in the various leases and purported amendments.

11a. As noted earlier, it is not clear from any of the evidence which tract of land Western eventually leased.

titled to rents under the sublease from September 1968 to the time of trial with interest on those accrued rentals. Lathrop was also awarded future rentals as they accrued, less any amounts received by Lathrop for the use of the substitute site in mitigation, as well as $5,073.32, the additional rental for the substitute site. The court further found that Lathrop had failed to substantiate its claim for damage to the building. The court ruled that the state should bear the cost of moving the building.

Western asserts three specifications of error. First, the court's holding that the action of the state in requiring removal of the building and taking possession of the premises was not a condemnation and did not terminate Western's lease with Lathrop; second, the trial court's refusal to permit Felix Aubuchon to testify at trial as to his intent in accepting the January 4, 1960, letter from the Director of the Division of Air Terminals; and third, the court's award of $5,073.32 as additional rental for the substitute leasehold site.

■ As to Western's first specification of error, we hold that the superior court was mistaken in concluding that Western's sublease did not terminate as a result of the action of the State of Alaska in taking possession of the leased premises. In reaching its conclusion, the trial court apparently assumed that under the terms of the assignment and sublease agreement of December 30, 1959, Western had agreed to remain bound under the sublease even if different property were substituted and that the letter of January 4, 1960, amended the 1953 lease from the State of Alaska to Western to require Lathrop to continue to be bound under that lease on substituted property. In our opinion, both of these assumptions were unwarranted.

We reach our holding by first looking to the terms of the December 30, 1959, assignment and sublease entered into between Hill's and PNA.[12] The provisions of the sublease relevant to this issue are the two provisions we have quoted above, the one being PNA's covenant to bear the cost of relocation or changes in any of the existing structures at the various airport facilities covered by the sublease, and the other providing for the termination of the sublease for any buildings or facilities that were taken by "eminent domain proceedings or by action of any city or public authority."

In this appeal, Western has argued that although either of these two provisions in the December 30, 1959, assignment and sublease can be read as governing the state's actions in the present case, the two provisions may be read as a part of a consistent whole if the first is read as referring "to an exercise of the police power" and the second is read as concerning "eminent domain and similar governmental actions."[13] We find Western's interpretation is internally consistent and does no violence to the language employed in the December 30, 1959, assignment-sublease agreement. The first provision relates only to structures or buildings and seems intended to apply to a situation where the governmental agency requires changes or relocation of buildings that are hazardous to public safety but does not disturb the leasehold interest itself.[14]

---

12. At this point the legal effect of the January 4, 1960, letter from the State of Alaska which was accepted by Felix Aubuchon on behalf of PNA will not be considered. Hereinafter, this letter will be referred to as the "Aubuchon Letter."

13. The Restatement of Property provides:
 The judicially ascertained intent of a conveyor is normally determined by the language employed in his conveyance, read as an entirety and in the light of the circumstances of its formulation. Restatement of Property § 242 (1940).

The comments to this section include the following:
 When the clauses or paragraphs, read seriatim, involve repugnancies but, read as mutually modifying one another, permit a construction as a consistent whole, the latter construction is adopted.
Restatement of Property § 242, comment o at 1198 (1940). Cf. 2 R. Powell, Real Property ¶ 222 [5] (1970).

14. Western's interpretation requires that the word "relocation" in the first provision refer to no more than a relocation

As to this first provision, Western points out that

> [a]s there is no claim that the State ordered the building to be removed by virtue of a proper exercise of its police power, the actions of the State are governed by the clause relating to eminent domain or action of any public authority.

Neither Lathrop nor the State of Alaska directly refutes this argument.[15]

We believe the second provision, on the other hand, was intended to apply where the action taken by the state actually destroys or terminates the leasehold interest. Lathrop and the state argue that this second provision does not apply to the facts of this case because there were no eminent domain proceedings instituted by the state.[16] However, we think this provision of the sublease should be interpreted to mean that the lease terminates whenever the leasehold is taken under the power of eminent domain, or actions by a public authority that are tantamount to a taking under the power of eminent domain. In the case at bar the state does not deny that its actions fit the description found in the second provision relating to a taking "by eminent domain proceedings, or by the action of any . . . public authority." The sublease, therefore, specifically provided for the situation in which the use of the buildings and property would be lost by the sublessee as a result of any action by a public authority. The second provision does not require the institution of formal eminent domain proceed-

ings in order for it to become operative. Thus, putting aside consideration of the legal effect, if any, of the Aubuchon Letter of January 4, 1960, we hold that the record in this case establishes that Western lost the use of the Anchorage International Airport facility through "the action of any . . . public authority," and that under the controlling second provision of the 1959 assignment-sublease, Western's sublease with Lathrop was terminated.

■ This leads us to consideration of Lathrop's contention that the Aubuchon Letter of January 4, 1960, amended the 1953 lease in such a manner that the 1959 assignment-sublease was not terminated by virtue of the state's actions in regard to the leasehold interests at the Anchorage International Airport and the building located thereon.[17] We have concluded that on the facts of this record the Aubuchon Letter was an ineffective attempt to amend the 1953 main ground lease. It follows that Lathrop cannot assert that the Aubuchon Letter precluded Western from relying upon the eminent domain provision of the 1959 assignment-sublease as the basis for its claim that the sublease was terminated by the actions of the state.

■ We reach this conclusion as to the legal effect of the Aubuchon Letter for the following reason. It is well established that "an agreement to agree" is not enforceable. 1 A. Corbin, Contracts § 29, at 84–85 (1960); 1 S. Williston, Law of Contracts § 45 (3d ed. W. Jaeger 1957). Professor

---

of the building to another area on the leased premises. Considering the large size of the parcel at the Anchorage International Airport and its location at an airport with stringent requirements of unobstructed flight path, control tower visibility, etc., this definition of "relocation" does not appear to be strained. Further, the fact that Western agreed to bear the costs of such removal leads to the conclusion that a continuation of the ground lease on the premises described in the sublease was also contemplated.

15. The state contends that Western's interpretation is not reasonable, because of the Aubuchon Letter and the amendment it purported to make in the 1953 lease.

16. The state argues that the September 11, 1967, notice from the state that the property would be needed for airport expansion was not a condemnation of Lathrop's leasehold interest because the Aubuchon Letter of January 4, 1960, amended the 1953 main lease to obligate PNA (and Lathrop as successor to PNA's assignee) to continue the terms of the original lease on substituted land provided by the state.

17. Lathrop bases this contention on the provision of the sublease that required Western to "perform each and every requirement of the said ground lease and as imposed by any . . . modification thereof."

Powell finds that an agreement "to attempt to negotiate the terms of a lease" has "no legal consequences." 2 R. Powell, Real Property ¶ 223, at 215 (1970). The specific terms of the Aubuchon Letter probably envisioned an agreement to agree in saying that a suitable area acceptable to both the state and PNA (Western) would be provided. The letter necessarily implied that an agreement on a suitable area would be reached. In "accepting" the Aubuchon Letter, PNA (Western) accepted an agreement to agree. This "agreement to agree" is not enforceable because the Aubuchon Letter did not contain a sufficiently definite offer to create a contract upon its acceptance by Felix Aubuchon on behalf of PNA. The Aubuchon Letter being an agreement to agree would, under the foregoing authorities, be held unenforceable because of its lack of definiteness. The Letter's indefiniteness concerns a matter of crucial importance to the contract, namely, its subject matter. The replacement property was not specified.[18] In regard to such situations, we have held

> [a]ny contract to be enforcible must be reasonably definite and certain as to its terms. To be final, the agreement must extend to all the terms which the parties intend to introduce and material terms cannot be left for future settlement.[19]

In light of the foregoing, we conclude that the superior court erred in holding that the action of the state in requiring removal of the building and taking possession of the premises at Anchorage International Airport was not a condemnation or taking by action of a state agency, which, under the second provision of the 1959 assignment-sublease, terminated the lease between Lathrop and Western. We therefore hold that the superior court's judgment in favor of Lathrop and against Western must be reversed and set aside.[20]

■ In its second specification of error, Western asserts that the trial court erred by virtue of its refusal to permit Felix Aubuchon to testify as to his intent in accepting the Aubuchon Letter from the Director of the Division of Air Terminals for the State of Alaska.

We find support for the ruling of the trial judge in the exercise of his discretion to ensure the orderly proceeding of the trial. At the time Western decided to call Felix Aubuchon its case had been completed with the exception of the testimony of Harry A. Wakefield, Director of the Division of Aviation, who was permitted to testify because he had been unavailable earlier. There is evidence that Aubuchon, on the other hand, had been present in the courtroom and available to Western during the earlier trial proceedings. Counsel for Western knew at trial, and had known for some time before, that the Aubuchon Letter of January 4, 1960, was an important document. It had been introduced into evidence. When the case was closed, it was made clear by the trial judge that the parties had "the right . . . to call Colonel Wakefield and that is all." We therefore hold that it was not an abuse of discretion for the trial judge to have precluded Aubuchon's testimony, for Western had concluded its case-in-chief and had waived rebuttal.[21]

---

18. None of the parties to this appeal have discussed the question of whether an instrument may amend a lease agreement by making a provision to substitute entirely different property for the leasehold. See 3A A. Corbin, Contracts § 686, at 236 (1960). There Professor Corbin, speaking in reference to lease agreements, states that "a lessee is bound to pay the agreed rent as long as the leasehold interest in the land is not ended."

19. Alaska Creamery Products, Inc. v. Wells, 373 P.2d 505, 510 (Alaska 1962)

(footnote omitted). *Compare* Rego v. Decker, 482 P.2d 834 (Alaska 1971).

20. Discussion of whether Western should be made subject to equitable defenses among which would be estoppel from challenging the legal effectiveness of the Aubuchon Letter because of its acceptance of the benefits of this agreement for nine years will be discussed subsequently.

21. Gafford v. State, 440 P.2d 405 (Alaska 1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 125 (1969); Pedersen v. State, 420 P.2d 327 (Alaska 1966);

■ In its last specification of error, Western contends that the trial court should not have awarded Lathrop the amounts by which the rent on the substituted property exceeded the rent for the original property. We think Western's position has merit.

The superior court's Memorandum of Decision contains the following language:

The lease rental of $5,073.32 noted in counsel for Lathrop's brief, and admitted as additional for the substituted site is also allowed and will be paid as accrued.

The aforementioned $5,073.32 was for additional rent on the substituted site for the period from 1968 to the time of trial in 1970. This amount apparently does not include future additional rents on the substituted site,[22] although the superior court's Memorandum of Decision would seem to require that Western pay not only for the additional rent which had accrued since the time of its breach, but for such additional rent as accrued in the future as well.

■ Lathrop contends that Western is responsible for these items of damages under what has been referred to as the first provision of the 1959 assignment-sublease agreement. The gist of this provision is that Western is to pay the costs of reloca-

tion or change in the existing structures. The costs incurred in relocating or changing a structure cannot be equated with incremental rent costs.[23] We therefore hold that the award was incorrect both as to the additional rents payable on the substituted property from 1968 to the time of trial and as to future accruals.[24]

On the basis of our analysis of the legal issues raised by Western in its three specifications of error, we conclude that the superior court's judgment in favor of Lathrop and against Western should be reversed. On the other hand, if we were simply to remand the matter to the superior court with direction to set aside Lathrop's judgment and to enter a judgment in favor of Western, we would have to overlook certain equitable considerations which, in our view, justice requires should be more fully litigated.

Review of the trial court's Memorandum of Decision shows that equitable considerations may have played some part in the court's decision.[25] We are unable to determine to what extent these equitable considerations governed the trial court's decision. No equitable theories were articulated by the trial court in its decision to support a disposition based on equitable princi-

---

Gunsolus v. City of Fairbanks, 391 P.2d 13 (Alaska 1964).

22. Two years rent on the substituted site based on the annual rent of $2,536.60, would be $5,073.20. In computing its damages, Lathrop erroneously listed the annual rent as $2,536.66. This accounts for the 12 cents difference in the totals.

23. The general rule is that damages for breach of contract are limited to such losses as were in the contemplation of the parties at the time the contract was made. C. McCormick, Law of Damages § 138, at 565 (1935). Under our interpretation of the assignment-sublease agreement, we do not believe that a continuation of the sublease on substituted land was contemplated. *See* n. 14, *supra.* Therefore, the additional rent could not have been a loss contemplated by the parties at the time the agreement was made.

24. Concerning the trial court's apparent award of damages for future additional rental, we have considered the legal effect of Lathrop's cancellation, during the pendency of this litigation, of the lease upon which this award was based.

25. In finding that the state should bear the costs of removing the building, the court noted that the state had benefited from the removal of the building, while the lessee had suffered some detriment therefrom. Also, the court was apparently impressed with what it found to be Western's attempt to use the state's request to vacate the leased premises as an excuse to terminate its sublease with Lathrop. These two findings in particular suggest that the trial court balanced equities to some extent.

ples. Also of significance is the fact that the record made in the superior court did not contain an adequate factual basis for proper determination of the equitable issues, either at the trial court level or before this court.[26]

On remand, both Lathrop and the State of Alaska should have the opportunity of litigating the question of whether some type of equitable estoppel should be applied against Western.[27] Additionally, depending upon the resolution of the equitable issues, Lathrop should be afforded the opportunity to assert and prove a claim for relief against the State of Alaska grounded on the state's action in "taking" Lathrop's leasehold interests and improvements at the Anchorage International Airport. In turn, the state should be given the opportunity to assert and prove a cross-claim against Western for any damages it may be found liable to pay to Lathrop because of its "taking" of Lathrop's leasehold and improvements.

The judgment of the superior court is reversed and the cause is remanded for further proceedings not inconsistent with the foregoing.

BOOCHEVER, J., not participating.

---

26. Our study of the record has left us with several unanswered questions that we believe may be crucial to an equitable resolution of this litigation. There is some indication in the record that Lathrop cancelled its lease on the substituted property. On remand the facts surrounding this cancellation should be developed. The record does not clearly indicate whether the parcel Western lease for its own cargo terminal facilities was the same Lot 7 of Block 4 it had applied for as Lathrop's agent. If on remand it develops that Western did not take a lease on Lot 7 of Block 4, we believe the record should indicate why Lathrop did not lease that parcel as the state proposed in its letter of December 26, 1967, a copy of which was sent to Lathrop. Further, the record now contains little evidence regarding Western's agency relationship with Lathrop, particularly the circumstances surrounding Western's apparently unilateral termination of the agency. By listing these areas wherein we found the record deficient, we do not intend to limit the parties on remand in their presentation of any other relevant facts not suggested by the present record nor the further development of those facts that have been touched on in the record.

27. In this appeal the state has not raised the estoppel issue. Lathrop, in its brief, raises this issue by implication, but cites no authority for its position. On remand, Lathrop and the state should furnish the trial court with appropriate briefs spelling out their precise theories in regard to estoppel or other equitable grounds for relief as well as their respective standing to assert such theories. Western in turn should be required to file briefs in opposition.