**WESTERN AIRLINES, INC., Appellant,**

v.

**The LATHROP COMPANY, Appellee.**

**No. 2236.**

Supreme Court of Alaska.

May 19, 1975.

Richard O. Gantz, Hughes, Thorsness, Lowe, Gantz & Powell, Anchorage, for appellant.

W. C. Arnold, Anchorage, for appellee.

Before RABINOWITZ, Chief Justice, and CONNOR and BOOCHEVER, Justices.

## OPINION

BOOCHEVER, Justice.

The factual background of this case has been related in some detail in our 1972 opinion Western Airlines, Inc. v. Lathrop Company.[1] We there held that the action of the State of Alaska in terminating its lease with Lathrop and requiring removal of the building subleased by Lathrop to Western constituted a condemnation by the state agency which terminated the sublease between Lathrop and Western.[2]

Due to the possibility of the state or Lathrop having a right to damages against Western under the doctrine of equitable estoppel, we remanded to enable the parties to litigate that question. Additionally, Lathrop was afforded the opportunity to prove a claim for relief against the state grounded on the state's action in "taking" Lathrop's leasehold interests and improvements at the Anchorage International Airport.[3] At the subsequent trial, the superior court held that equitable estoppel had not been established, and there has been no appeal from that ruling. The court further held that Lathrop was entitled to damages from the State of Alaska for termination of its lease which otherwise would have run from the date of such termination by the state, June 1, 1968,[4] to September 30, 1973. The amount awarded was $101,167.99 computed as follows:

| | | |
|---|---|---|
| (a) Loss of annual rental $1,447.95 x 64 months (6–1–68 to 9–30–73) | | 92,668.80 |
| (b) The red building Reversionary interest as of 6–1–68 | 23,500.00 | |
| Less cost of removal | 13,000.81 | |
| | 10,449.19 | |
| Less sale | 2,000.00 | 8,499.19 |
| Total of (a) and (b) | | $101,167.99 |

The court further found that Lathrop had a right by virtue of its contract with Western to a lease from the state for an additional period of three years to September 30, 1976, and that Lathrop was also entitled to additional rent from Western for a substitute site to which the building was removed in the amount of $5,073.20. Damages were awarded to Lathrop against Western in the amount of $49,380.47 computed as follows:

| | | |
|---|---|---|
| (a) Additional rent for substitute site | 5,073.20 | |
| (b) $1,447.95 for 36 months (9–30–73 to 9–30–76) | | |
| 6 months w/o discount | | 8,687.70 |
| 30 months w/8% discount | | 39,963.42 |
| reduction to present value | | 48,651.12 |
| (c) Less credit for 3 months paid in June, July & August 1968 ($1,447.95 x 3) | | 4,343.85 |
| | 44,307.27 | |
| | $49,380.47 | |

Additionally, Lathrop was awarded costs and $5,788.00 in attorney's fees against Western.

1. 499 P.2d 1013 (Alaska 1972). Since the factual background is involved and has been clearly set forth in our prior opinion, reference is made to that opinion for those who wish a comprehensive statement of the facts. In this opinion, "Western" will be referred to as encompassing its predecessor, Pacific Northern Airlines, Inc., with which it merged in 1967. "Lathrop" will be used to include Hill's, Inc. which was merged with it.

2. 499 P.2d at 1020.

3. 499 P.2d at 1022.

4. There was a dispute as to the date of taking. The trial court found it to be June 1, 1968 which was the approximate date when the state first actually physically interfered with the use of the premises. That factual finding was supported by substantial evidence, and we therefore hold that it was not clearly erroneous which is the standard of appellate review set forth in Alaska R.Civ.P. 52(a) and explained in Alaska Foods, Inc. v. American Manufacturer's Mut. Ins. Co., 482 P.2d 842 (Alaska 1971). See State v. Abbott, 498 P.2d 712 (Alaska 1972); Myers v. Sill, 497 P.2d 920 (Alaska 1972).

Western has appealed from the superior court's judgment contending:

1. That the trial court erred in failing to find that Lathrop was granted a three-year extension of the principal lease to September 30, 1976, so that when the lease was terminated by the state, Lathrop became entitled to damages from the state and not from Western for that additional period of time,

2. That the amount of damages awarded against Western was improperly computed,

3. That it was error to award Lathrop damages against Western in the amount of $5,073.20 for rental payments made by Lathrop to the state for other property on which to store the building, and

4. That the court erred both in awarding Lathrop rather than Western attorney's fees as the prevailing party and in the amount awarded for such fees.

I

Western (through its predecessor Pacific Northern Airlines, Inc.) entered into an agreement with Lathrop (through its predecessor, Hill's Inc.) on December 30, 1959 whereby in exchange for a sum of money, Western assigned its principal lease from the state and sold the building located on the leased premises to Lathrop. Simultaneously, Lathrop subleased the premises to Western for a 15-year period terminating on December 31, 1974. Since the underlying lease due to expire on September 30, 1963 contained an option to renew for an additional 10 years, the sublease still extended 15 months beyond the termination date of the underlying lease, or September 30, 1973. The sublease specified that it was conditioned on the lessor's (Lathrop's) obtaining a ground lease from the state

"upon the same terms and conditions" as theretofore existed. There was also some evidence that Western had obligated itself to procure the requisite extension pursuant to an earlier separate agreement with Lathrop.[5]

Prior to this assignment-sublease, Western wrote a letter to the State Director of the Division of Air Terminals dated December 24, 1959 in which it exercised its option to renew for the ten-year period [6] and further requested a three-year extension period beyond the renewal period. On January 4, 1960, a reply was received stating in pertinent part:

Your request dated December 28th has been considered, and the following amendments to your lease . . . are hereby granted:

1. Option to renew for ten (10) years from October 1, 1963 to September 30, 1973 is accepted.

2. Extension of the lease for a period of three (3) years to September 30, 1976 is granted.

In accordance with the foregoing, your said lease of the premises shall expire September 30, 1976.

Although this letter shall be sufficient evidence of your notification of the above, formal documents will be forwarded to your office within a short time in order that the officers of Pacific Northern Airlines may execute the same, together with the undersigned, to complete this matter. *However, if the present airport improvement program necessitates the moving of your building, a suitable area acceptable to the airport management and Pacific Northern Airlines will be provided.*

---

5. This agreement is tentatively hinted at in a letter from Western (PNA) to Lathrop (Hill's) dated December 7, 1959. The testimony of Mr. Felix Aubuchon, a former vice-president of operations for PNA, also suggested that such a commitment existed. He stated that as of early December 1959, he was expected to obtain the extensions required for the pending deal with Hill's.

6. Western had the right to the ten-year renewal upon notifying the state. This right was not dependent on the state's acceptance and is not at issue here.

Please return a copy of this letter to this office after it has been signed by an authorized officer of Pacific Northern Airlines in the space provided below. (emphasis added)

Subsequently, on February 4, 1960, Western unconditionally assigned its interest in the principal lease together with all renewals and extensions for the period of January 1, 1960 to September 30, 1976 to Lathrop. Although Western acted in reliance on the aforesaid letter, Lathrop relied exclusively on its assignment contract with Western and did not become aware of the proposed amendments contained in the letter until the summer of 1967 when the events culminating in this litigation began to transpire. Thus, the critical issue on this appeal is whether the letter operated effectively to extend the principal lease for the period of September 30, 1973 to September 30, 1976. If the extension proves unenforceable, then the extent of Western's liability for breach of contract must be determined. Obviously, if the extension amendments are found to be valid, Western cannot be held liable to Lathrop under any contractual theory.

In our prior opinion, it was held that the letter of January 4, 1960 constituted merely an agreement to agree which was not enforceable.

The letter necessarily implied that an agreement on a suitable area would be reached. In "accepting" the Aubuchon Letter, PNA (Western) accepted an agreement to agree. This "agreement to agree" is not enforceable because the Aubuchon Letter did not contain a sufficiently definite offer to create a contract upon its acceptance by Felix Aubuchon on behalf of PNA. The Aubuchon Letter being an agreement to agree would, under the foregoing authorities, be held unenforceable because of its lack of definiteness.[7]

We therefore concluded:

. . . that on the facts of this record the *Aubuchon Letter* [*of January 24, 1960*] *was an ineffective attempt to amend the 1953 main ground lease.* It follows that Lathrop cannot assert that the Aubuchon Letter precluded Western from relying upon the eminent domain provision of the 1959 assignment-sublease as the basis for its claim that the sublease was terminated by the actions of the state. (emphasis added)[8]

In light of this holding and the language of the disputed letter, two possible interpretations emerge. Western urges that there were two distinct and independent amendments agreed to in the letter. First, there was an agreement to extend the principal lease for three years which the appellant contends constituted a valid bilateral contract supported by the mutual obligations of the state to lease and PNA (Western) to pay rent. Secondly, Western asserts that the state, in an entirely separate and allegedly unrelated paragraph, attempted to amend the original lease by obtaining from PNA (Western) an agreement to agree on a suitable new site in the event the state's expansion of the terminal required use of the original premises. Western concludes that, since only the latter agreement was *expressly* invalidated by the Supreme Court of Alaska in our prior opinion, a lease including an enforceable extension agreement was assigned to Lathrop on February 4, 1960.

The other possible interpretation was the one adopted by the trial court based on the assumption that it was the one mandated by our invalidation of the agreement to agree. The lower court stated:

But going within the guidelines of the supreme court and by their interpretation that the Aubuchon Letter was an agreement to agree, the 3 year extension period was obviously a conditional require-

---

7. Western Airlines, Inc. v. Lathrop Co., 499 P.2d at 1020.

8. *Id.* at 1019.

ment that the agreements—that an agreement be reached and the inverse would be true if there was no agreement as to a site I would have to assume that there would be no 3 year extension. So, on that basis and because of what the Supreme Court has ruled, I would hold that the extension period itself would be inoperable, however, not as far as Lathrop is concerned.[9]

Aside from posting the two conflicting interpretations of the contractual language contained in the letter, the parties cite no case authority which would specifically support their differing positions. It is, however, well-settled that the primary function of judicial interpretation of a contract is to ascertain and give effect to the intention of the parties.[10]

Recently, in Day v. A & G Construction Co., Inc.,[11] we announced the test that we would apply in determining the intent of parties who have entered bilateral real estate or commercial contracts, stating:

"Expectation" or "understanding" standards allow substantially more leeway since a reasonable man is placed in the position of the parties, and the question is what he would reasonably expect that language to mean under the circumstances. Both Williston and the Restatement adopt the standard which ascertains intention through "reasonable expectation." We hold the appropriate standard to apply here is that of the reasonable expectation of the parties, i. e. "the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party", and the meaning which

the recipient of the communication might reasonably have given to it.[12]

Thus, the interpretation of the aforesaid letter must be guided in part by these general principles of construction. Although Western views the state's abortive attempt to obtain an agreement to move the building as almost a "parenthetical expression" and not a condition of the extension, it is relatively clear that the state, at least, intended the grant of the three-year extension to be contingent upon the right to move the building at anytime during the remainder of the lease (from January 4, 1960 through September 30, 1976). The crucial sentence is *not* in an unrelated paragraph, but immediately follows the state's indication that it wanted the amendment formalized as soon as possible. The sentence begins with the word "however" which seems to be used in its provisional sense.[13] Construing the letter as a whole, the proviso (PNA must agree to agree) can relate to either the grant of the option to renew or the extension or both. Under the terms of the original lease, however, the state was obligated to grant the option to renew for a ten-year period, so the condition can only relate to the extension.

Thus, an analysis of the literal meaning of the words used and of the format of the letter itself indicates that essentially one contract (not two) to amend the principal lease was envisioned by the state. That is, the state in consideration of Western's (PNA's) modification of the main lease was willing to grant the three-year extension. This would most probably conform to what must have been the actual intent of the state at the time. It would

---

9. Lathrop also construes the grant of the extension as conditioned on the modification of the terms of the existing lease, i. e. the agreement to relocate if necessary.

10. Day v. A & G Constr. Co., Inc., 528 P.2d 440, 444 (Alaska 1974); Smalley v. Juneau Clinic Bldg. Corp., 493 P.2d 1296, 1304 (Alaska 1972); Port Valdez Co. v. City of Valdez, 437 P.2d 768, 771 (Alaska 1968).

11. 528 P.2d 440 (Alaska 1974).

12. *Id.* at 444–45 (footnotes omitted).

13. One of the primary definitions of "however" contained in Webster's New International Dictionary (2nd ed. unabridged 1960) reads in pertinent part:
 2. Nevertheless; notwithstanding; yet; still;—*often indicating a reservation after something conceded* or a decision after consideration of adverse points. . . .
 (emphasis added)

seem most unlikely that the state would knowingly lock itself into a three-year extension of the lease (1973–76) on the same terms as before realizing that, long before 1973, it might have to take over those premises without trying to provide for a compromise site or at least an agreement to compromise. Thus, the interpretation advocated by Western, which would have the court read the extension and the relocation agreement as independent covenants, fails the first half of the Day v. A & G Construction "reasonable expectations" standard since, in light of the state's expressed needs, it might reasonably understand that the language it used would be construed as conditional by the other party.

Western's interpretation also fails the second portion of that test, i. e. the meaning the recipient might reasonably have given the words used. This is because Western (PNA) was put on notice by the very proviso which was later held unenforceable that expansion was imminent and, for reasons similar to those quoted above, it would be unreasonable for the recipient to assume that the state was merely bargaining for a promise on its part to pay rent which would have been implied anyway. The only reasonable conclusion would be that the consideration the state was looking to at the time it granted the extension was the right to transfer that lease to an alternate site prior to or during that extension period.

Moreover, this construction is consistent with the implicit holding of our prior opinion in which the entire letter, with the exception of the mandatory ten-year extension period, was regarded as an ineffective attempt to amend the 1953 lease.[14] We therefore affirm the trial court's interpretation that no three-year extension of the lease beyond September 30, 1973 was obtained by Western.

## II

■ Given our present holding that Western failed to extend the principal lease from September 30, 1973 to September 30, 1976, Lathrop contends that Western is liable for breach of an implied covenant that it had good right and title to make the assignment of the lease for the entire period specified. Lathrop analogizes this case to Richardson v. Van Dolah [15] wherein the Ninth Circuit Court of Appeals held that a sublease contains an implied covenant that the sublessor has good right and title to make the same. Furthermore, Lathrop seems to argue that, in any event, Western was under a separate contractual obligation to procure the extension referred to above. Arguably, the potential damages under the second theory—the contract to procure the extension—would not be as extensive, since the implied expiration date under that contract would be coextensive with the term of the Hill's-PNA leaseback arrangement of December 31, 1974. We find, however, that it doesn't make any difference for purposes of measuring actual damages in this case which contract Lathrop is suing on, since Lathrop only claimed *and proved* the damages through the end of 1974.

The trial court therefore erred when it awarded Lathrop contract damages measured by the sublease agreement with Western for the entire three-year period from October 1, 1973 to September 30, 1976. Although Lathrop may have been free to seek and prove damages based on the entire extension period, there is absolutely no evidence in the record to support the trial judge's award beyond the initial 15 months during which Western was obli-

14. In Patrick v. Sedwick, 413 P.2d 169, 173 (Alaska 1966), we approved of the well-established rule that whatever issues have been decided on a first appeal will not be considered on a second appeal in the same case absent "exceptional circumstances". No exceptional circumstances have been presented to us, but since there was some question as to the holding of our prior opinion as to whether a valid three-year extension was granted by the state, we have expanded on that aspect of our prior opinion.

15. 429 F.2d 912, 915 (9th Cir. 1970).

gated to make payments pursuant to the sublease. Lathrop now seeks to justify the trial court's award for the additional period on the ground that the original agreement granted Western an option to renew its sublease for a five-year period at a rental to be agreed upon, and that therefore the original sublease would probably have been continued throughout the remainder of the extension period. Lathrop concludes that the trial court properly used the present monthly rental as the measure of damages for that future period. This argument must fail since Western had not as yet exercised that option, and since the parties had not as yet agreed to the rental for that renewal period. In the absence of any other testimony indicating what the fair rental value of that lease would be during the remaining period, the trial judge's findings remain unsupported. We hold then that Western is liable to Lathrop only for rentals due during the first 15 months of the extension period and that the trial court erred in awarding Lathrop any damages for the period beyond December 31, 1974.

### III

 The trial court also erred in awarding to Lathrop additional rent in the amount of $5,073.20 covering the period from June 1, 1968 to the date of trial for the substituted site on which the red building was placed.

This issue was disposed of in our prior opinion wherein we stated:

> The aforementioned $5,073.32 [16] was for additional rent on the substituted site for the period from 1968 to the time of trial in 1970. This amount apparently does not include future additional rents on the substituted site . . . ..

16. For an explanation of the $.12 differential, *see* Western Airlines, Inc. v. Lathrop Co., 499 P.2d at 1021, n. 22.

17. *Id.* at 1021 (footnotes omitted).

18. *Id.* n. 23. We do not have before us any issue as to whether Lathrop may seek recovery of the amount so paid from the state.

Lathrop contends that Western is responsible for these items of damages under what has been referred to as the first provision of the 1959 assignment-sublease agreement. The gist of this provision is that Western is to pay the costs of relocation or change in the existing structures. The costs incurred in relocating or changing a structure cannot be equated with incremental rent costs. We therefore hold that the award was incorrect both as to the additional rents payable on the substituted property from 1968 to the time of trial and as to future accruals.[17]

In a footnote to the above passage, we also observe that Lathrop could not recover these unanticipated damages on a breach of contract theory.

> The general rule is that damages for breach of contract are limited to such losses as were in the contemplation of the parties at the time the contract was made. C. McCormick, Law of Damages § 138, at 565 (1935). Under our interpretation of the assignment-sublease agreement, we do not believe that a continuation of the sublease on substituted land was contemplated. *See* n. 14, *supra*. Therefore, the additional rent could not have been a loss contemplated by the parties at the time the agreement was made.[18]

### IV

At the conclusion of the proceedings below, Lathrop was awarded attorney's fees in the amounts of $12,468.32 against the state and $5,788.00 against Western pursuant to Alaska R.Civ.P. 82(a).[19] Costs were assessed against each defendant below in favor of Lathrop in the amount of $269.25 pursuant to Alaska R.Civ.P. 54(d).

19. Alaska R.Civ.P. 82(a) provides in part:

> (a) Allowance to Prevailing Party as Costs.

> (1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any

Western has appealed from those awards arguing that it was clearly the prevailing party and, therefore, it should have been awarded costs and attorney's fees pursuant to the aforesaid provisions as a matter of course. Alternatively, Western argues that the *amount* of the attorney's fees charged against it constituted an abuse of the trial court's discretion.

In reviewing a trial court's assessment of attorney's fees granted at its discretion under Alaska R.Civ.P. 82(a)(1), we will disturb such a finding only upon a showing that the award was "manifestly unreasonable".[20] Therefore, any party seeking to overturn a trial court's decision in this regard has a heavy burden of persuasion.

Western contends that it was manifestly unreasonable for the trial court not to have concluded that it was the prevailing party. Admittedly, Western prevailed against both Lathrop and the state on the issue of equitable estoppel, which was certainly one of the main issues litigated. However, Lathrop prevailed against Western on the issue of contractual liability. In Buza v. Columbia Lumber Co.,[21] we stated:

. . . [I]t has been established by case law that the prevailing party to a suit is the one who successfully prosecutes the action or successfully defends against it, *prevailing on the main issue, even though not to the extent of the original contention.* He is the one in whose favor the decision or verdict is rendered and the judgment entered. (emphasis added)

Within the total context of the case, it was not unreasonable for the trial judge to consider Lathrop and not Western the prevailing party, and we affirm that holding.

The amount of the attorney's fees was computed under Rule 82(a). The court committed no error in utilizing the rule, but the amount allowable must be recomputed after elimination of the excess amount of damages awarded.

We recompute the amount of damages to which Lathrop is entitled from Western as follows. Monthly rental under the sublease was $1,573.30. Net expenses under the principal lease were $125.35 so that Lathrop's net monthly income was $1,447.95. As between Lathrop and Western, this is an action for breach of contract. Lathrop is thus entitled to the rents due from September 30, 1973 to the date of judgment, April 17, 1974, with interest at 6 percent per annum.[22] Rents due after April 17, 1974 must be discounted to their value as of that date.[23] The trial court established a discount rate of 8 percent which has not been challenged by either party,

money judgment therein, as part of the costs of the action allowed by law:

*Attorney's Fees In Average Cases*

| | Contested | Without Trial | Non-Contested |
|---|---|---|---|
| First $2,000 | 25% | 20 % | 15 % |
| Next $3,000 | 20% | 15 % | 12.5% |
| Next $5,000 | 15% | 12.5% | 10 % |
| Over $10,000 | 10% | 7.5% | 5 % |

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court as a part of the costs of the action, in its discretion, in a reasonable amount.

(2) In actions where the money judgment is not an accurate criteria for determining the fee to be allowed to the prevailing side, the court shall award a fee commensurate with the amount and value of legal services rendered.

(3) The allowance of attorney's fees by the court in conformance with the foregoing schedule is not to be construed as fixing the fees between attorney and client.

20. Froelicher v. Hadley, 442 P.2d 51 (Alaska 1968); Palfy v. Rice, 473 P.2d 606, 613 (Alaska 1970) (an abuse of discretion is established where it appears that the trial court's determination as to attorney's fees was manifestly unreasonable); Morrison-Knudsen Co., Inc. v. State, 519 P.2d 834 (Alaska 1974); and most recently in Grasle Electric Co. v. Clark, 525 P.2d 1081 (Alaska 1974).

21. 395 P.2d 511, 514 (Alaska 1964) footnotes omitted).

22. AS 45.45.010(a)(1) provides for interest at 6 percent per annum on "money after it is due".

23. This is not a situation where the amount could be increased as a result of inflationary factors such as considered in Beaulieu v. Elliott, 434 P.2d 665, 671–72 (Alaska 1967). The rentals are for fixed sums.

and we shall accept that rate as reasonable. We compute the amount due as follows:

(a) $1,447.95 for 15 months
9–30–73 to 12–31–74
6 months & 17 days w/interest at
6% per annum $10,316.08
7 months & 13 days discounted at
8% per annum $11,280.30
 $21,596.38

(b) less credit for 3 months
June, July & August 1968
plus interest at 6% per
annum to 4–17–74 $ 6,082.25

Total $15,514.13 24

The attorney's fees awarded to Western shall be amended to $2,401.41, the amount allowable under Rule 82(a).

The case is remanded for the purpose of issuing an amended judgment in accordance with this opinion.

Reversed in part and remanded.

ERWIN, J., not participating.

24. The amended judgment will be with interest at 8 percent per annum from April 17, 1974. AS 09.30.070 provides:

The rate of interest on judgments and decrees for the payment of money is eight per cent a year, except that a judgment or decree founded on a contract in writing, providing for the payment of interest until paid at a specified rate not exceeding the legal rate of interest for that type of contract, bears interest at the rate specified in the contract if the interest rate is set out in the judgment or decree, but in no event may it be more than 10 per cent a year.