**Oma Belle DAY, Appellant,**

v.

**A & G CONSTRUCTION CO., INC.,**
**a corporation, Appellee.**

**No. 2034.**

Supreme Court of Alaska.

Nov. 29, 1974.

---

9. It should be noted that the state did not offer any opposition to B.A.M.'s appeal.

Mark C. Rowland, William A. Greene, Anchorage, for appellant.

W. C. Arnold, Anchorage, for appellee.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

BOOCHEVER, Justice.

This appeal concerns the interpretation of a contract and the application of facts to that interpretation.

Oma Belle Day is a widow in her late seventies who homesteaded property in the Valdez area 25 to 30 years ago. The discovery of oil on the North Slope and the plan to pipe the oil to Valdez made the homesteaded property potentially valuable for commercial development. A & G Construction Co., Inc. became interested in the land and commenced negotiations with Oma Day regarding its purchase. On June 27, 1969, two documents were executed by Mrs. Day and A & G. The documents were drafted by A & G's attorney, W. C. Arnold. They were executed in his office in the presence of Oma Day and George Atkinson, President of A & G. Charles Jett, an A & G employee engaged to develop the Day property in Valdez, and several members of Oma Day's family were also present. Mrs. Day was not represented by counsel.

The documents were a "Lease and Option" and a "Memorandum". The lease and option described the property and granted from Oma Day to A & G: (1) a lease of the property for ten years at the rate of $1.00 per year, and (2) an option costing $100,000 to buy the property at a gross price of $1,000,000 with $250,000 (which included the cost of the option) payable upon exercise of the option, and the balance payable at $75,000 per year at six percent over ten years. The memorandum obliged A & G to establish marketable title to the property (there were defects). The memorandum's most important provision, the subject of this action, provided for Oma Day to share in the profits of development, lease or resale of the property by A & G. Oma Day was entitled to 50 percent of the net profit on resale. Net profit was defined as the remainder after "deducting all costs incurred in connection with acquisition and development including purchase price and improvements on or for the benefit of the property." In addition, Mrs. Day was to receive five percent of the net profits from leasing or five percent of the net profit on "any construction or other contract obtained by reason of ownership of the property".

A & G exercised the option and made the payments under the sale contract for the next two years, including $95,019 in interest. During that time, A & G diligently endeavored to develop the property for commercial use. It had hoped to reactivate electrical facilities on the land, install an aggregate plant to process magnetite and obtain cement-coating contracts for nearly the entire Alaska pipeline. There were also plans to develop a deep-water dock to serve the pipeline, and perhaps even lease a tank field and pipeline terminus to the pipeline consortium. The pipeline consortium did not concur in the development plans, and made it clear that only an actual sale of the land, which had been chosen as the terminus for the pipeline, would be acceptable.

Eventually, a sale of the land for $2,000,000 was consummated. The gross profit was $1,000,000; it, therefore, became necessary to compute the "net profit" to be shared by the parties. A & G sub-

mitted an accounting, and a dispute arose immediately over the amount of deductions. After payment to Mrs. Day of the remaining balance of the $1,000,000 fixed sum due under the lease and option agreement and reimbursement to A & G of the balance of $1,000,000, the parties each received $300,000, and the remaining $400,000 was placed in escrow to be disbursed according to the judgment of the court in an action for accounting to be filed.

This action for accounting was filed by A & G, and Oma Day answered. The parties entered into a pre-trial stipulation in which Oma Day relinquished the right to contest the "amount of disbursements made by A & G" but reserved the right to dispute "that said disbursements or any of them were properly chargeable in computing net profit". Oma Day also reserved the right to dispute the "characterization of certain expenditures as set forth in said statement".

At trial, George Atkinson, President and 75 percent stockholder of A & G, testified to the nature of the transaction and to the nature of the deductions claimed. Oma Day briefly testified regarding the circumstances surrounding execution of the documents. Each party called expert accountants. A & G's accountant, Ray Grundhauser, discussed specific facts relating to the assembling of the expense claims of the company and gave expert opinions about generally accepted accounting practices as applied to the Day/A & G agreement. Day's expert, William Rompa, limited his testimony to the latter. Following trial, the court allowed all of A & G's claims except one major item which is *not* the subject of a cross-appeal. The court rendered an oral decision for A & G and then filed findings of fact and conclusions of law. The operative finding of fact concluded as follows:

. . . The venture was highly speculative and when retained ownership possibilities were exhausted, Plaintiff sold the property for $2,000,000 or twice its original purchase price. There was no indication of over-reaching or unconscionable conduct and the evidence showed that Plaintiff was endeavoring by every means available to it to develop the property and bring it into production by leasing or otherwise or, in the alternative, to sell it at an advantageous price. In light of the scope of the transaction, the difficulties encountered, and the sale price eventually obtained, the expenditures proven were reasonable and necessary to the venture and fell within the meaning and intent of the agreement between the parties respecting the deductions to be made from the proceeds of the sale in computing net profits.[1]

The remainder of the findings and conclusions computed the judgment. The court entered an in personam judgment against Oma Day and directed the distribution of the escrow in accordance with its

---

1. The preceding portion of the court's finding specified:

The remaining items listed on the summary sheet for interest paid to Defendant Oma Belle Day, cost of money used in the transaction, 20% of the salary of George Atkinson, president of Plaintiff corporation, 80% of the salary of C. Jett who was employed by Plaintiff on a full time basis in connection with the transaction, certain payroll costs including profit sharing contributions and insurance and payroll charges of certain other employees, together with professional fees, expenses incurred in an effort to develop certain magnetite claims, travel, meals, and lodging, real and personal property taxes, expense of clearing land and maintaining a trailer, totalling $352,686.00, together with other items listed on the three page document entitled "Additional Valdez Expense," totalling $10,539.24, were substantiated by the testimony of Plaintiff. The agreements between the parties as set forth in finding No. II above contemplated without order of priority, that Plaintiff would (1) undertake to develop the property, retain ownership and lease it, (2) obtain contracts on or by reason of its ownership, or (3) sell it advantageously. Plaintiff is in the contruction business. Expenditures would be advanced by Plaintiff and income or profit derived was to be divided as set forth above.

decision. Notice of appeal was timely filed.

On this appeal Mrs. Day contests the interpretation placed upon the term "costs" in computing the net profits and further contends that specific items were not properly chargeable as "incurred in connection with acquisition and development". She also challenges the award of an in personam judgment against her.

## I. INTERPRETATION OF THE CONTRACT

Upon review of a trial court's decision pertaining to a contract, the interpretation of words is ordinarily held to be a matter for the court, while resolution of a dispute as to the surrounding circumstances is for the trier of facts.[2] Here we have no basic dispute as to the surrounding circumstances, and we thus consider questions pertaining to the meaning to be given to the words of the contract in the same manner as questions of law.[3]

We are required to interpret the portion of the memorandum which specified:

If A & G acquires the property pursuant to the option and sells or leases same or develops same or is able by reason of its ownership to obtain construction or building contracts on or connected with the property or approaches to it, or roads, pipelines, or other facilities connected with it, then A & G will pay:

(a) 50% of the net profits on any sale of the property. Net profits to be computed by deducting all costs incurred in connection with acquisition and development including purchase price and improvements on or for the benefit of the property.

(b) 5% of any net rental or use charge received by A & G after it has reimbursed itself for all costs incurred as above described.

(c) 5% of the net profits of A & G on any construction or other contracts obtained by reason of the ownership of the property.

Oma Day does not contest on appeal the allowance of professional (legal, lobbying, engineering and surveying) fees or the allowance of the cost of grading and clearing part of the land. These items total $26,953.

There can be no doubt but that the portion of the provision quoted above [subparagraph (a)] which establishes the method by which "net profits" are to be determined is subject to varying interpretations and is thus ambiguous. Accordingly, there was no dispute at the trial about the admission into testimony of extrinsic evidence pertaining to the circumstances surrounding the execution of the contract and the intentions of the parties.[4]

---

2. 3 Corbin, Contracts § 554 (1960). *See* Deering Milliken & Co. v. Modern Aire of Hollywood, Inc., 231 F.2d 623 (9th Cir. 1956); Wilson v. Homestead Valve Mfg. Co., 217 F.2d 792 (3rd Cir. 1955), cert. denied 349 U.S. 916, 75 S.Ct. 606, 99 L.Ed. 1250 (1955); Jordan Marsh & Co. v. Patterson, 67 Conn. 473, 35 A. 521 (1896); Huntsman v. Eldon Miller, Inc., 251 Iowa 478, 101 N.W.2d 531 (1960); Atwood v. Boston F. & T. Co., 310 Mass. 70, 37 N.E.2d 121 (1941); Lott v. Guiden, 205 Pa.Super. 519, 211 A.2d 72 (Pa.1965).

3. On questions of law, this court is not bound by the lower court's views and, consequently, the "clearly erroneous" standard used in reviewing a trial court's factual findings is inapplicable. Peters v. Juneau-Douglas Girl Scout Council, 519 P.2d 826, 833 (Alaska 1974).

4. We have previously held that where the terms of a contract are ambiguous such extrinsic evidence is admissible. Smalley v. Juneau Clinic Bldg. Corp., 493 P.2d 1296, 1305 (Alaska 1972); Port Valdez Co. v. City of Valdez, 437 P.2d 768, 771 (Alaska 1968); Pepsi Cola Bottling Co. v. New Hampshire Ins. Co., 407 P.2d 1009, 1013 (Alaska 1965). There is a possibility of some confusion arising out of the rationale of our prior decisions as to the use of extrinsic evidence in cases where contract language is not ambiguous. *Compare* Smalley v. Juneau Clinic Bldg. Corp., *supra*; Port Valdez Co. v. City of Valdez, *supra*; Pepsi Bottling Co. of Anchorage v. New Hampshire

There are different theories espoused as to the standard to be applied in contract interpretation. We have previously stated that we must attempt to give effect to the intention of the parties,[5] but, in pursuit of that often illusory goal, we have not previously had occasion to discuss the proper methodology. Williston identifies five standards of potential application: (1) a community standard, using the common and normal sense of the language employed; (2) a limited community standard restricted to the locality in which the parties reside, or the business they share; (3) a mutual standard, looking at the meanings understood by the parties even though such understanding does violence to the English language; (4) an individual standard which looks to the specific intention of each contracting party and (5) a reasonable expectation standard which looks to "the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party."[6] The Restatement's commentary adds a sixth standard which looks at the meaning which the recipient of the communication might reasonably have given it.[7]

Obviously, the same standards cannot be applied to the interpretation of all types of contracts. For example, much of the language of a promissory note will be governed by statutory provisions. Interpretation of insurance contracts is controlled by standards not necessarily applicable to other types of contracts, due in part to the inequality in bargaining power and to the greater necessity for certainty required for ascertaining rates to be paid for policies.

In interpreting a bilateral real estate or commercial contract of the type here involved, we find little difficulty in choosing the standard to apply.

Of these tests, the third and fourth are subjective, looking to the specific intent of the party or parties. The other standards are objective. While we are endeavoring to give effect to the intention of the parties, looking to their testimony as to their subjective intentions or understandings will normally accomplish no more than a restatement of their conflicting positions. To say that we are adopting a standard as to the subjective meanings understood by the parties or by each of the parties is little more than restating the goal of interpretation, to give effect to the intention of the parties. It furnishes no true standard for a court to apply, and we accordingly reject the third and fourth standards of interpretation.

■ Community standards impose strict precision upon the parties since they will be held to the bargain that the community thinks they made regardless of whether they subjectively intended such a bargain. A community standard applied rigidly without consideration of the circumstances surrounding the execution of a contract could well defeat the object of the parties in entering into the contract. Custom and community standards may be a consideration in ascertaining the expectations of the parties, but independently of such determination should not be the controlling factor in the type of contract before us.

■ "Expectation" or "understanding" standards allow substantially more leeway since a reasonable man is placed in the position of the parties, and the question is what he would reasonably expect that language to mean under the circumstances.

Ins. Co., *supra*, *with* Alaska Placer Co. v. Lee, 455 P.2d 218 (Alaska 1969). *See* R. Erwin, "Parol Evidence or Not Parol Evidence in Alaska," 8 Alaska L.J. 20 (1970). Since in this case there is no dispute but that the portion of the contract at issue is ambiguous, we do not deem this opinion to be an appropriate vehicle for clarification.

5. Smalley v. Juneau Clinic Bldg. Corp., 493 P.2d 1296, 1304 (Alaska 1972) ; Port Valdez Co. v. City of Valdez, 437 P.2d 768, 771 (Alaska 1968).

6. 4 Williston, The Law of Contracts § 603 at 344 (3rd ed. 1961).

7. Restatement of Contracts § 227, Comment a(6) (1932).

Both Williston and the Restatement adopt the standard which ascertains intention through "reasonable expectation." [8] We hold the appropriate standard to apply here is that of the reasonable expectation of the parties, i. e. "the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party",[9] and the meaning which the recipient of the communication might reasonably have given to it.[10]

We are concerned with interpreting the phrase:

Net profits to be computed by deducting all costs incurred in connection with acquisition and development including purchase price and improvement on or for the benefit of the property.

Counsel for Mrs. Day argues that the term "costs" should be interpreted in a technical tax accounting sense so that only those costs would be included which would add to the assets by increasing their value —in effect, capital investments—as contrasted to "expenses" (expenditures of money that are used up in the sense they add no value to the property or are not re-

flected in the value of the property). A & G, on the other hand, contends that the word "costs" was used in its common meaning—an expenditure of money or other valuable consideration for goods or services. Any such expenditure in connection with the "acquisition and development" of the property would thus be included.[11]

The trial court while not rendering any specific definition of the term, indicated its approval of A & G's approach by allowing the disputed items [12] "in light of the scope of the transaction, the difficulties encountered and the sale price eventually obtained."

■ In reaching our interpretation of the disputed term, we are persuaded that A & G was justified in expecting Mrs. Day to view the term "costs" in its broad common sense rather than in a technical accounting context. We believe that the nontechnical meaning is the one that Mrs. Day reasonably would have given to the term. The venture was highly speculative. Major oil companies with great economic power were the intended target of A & G's

---

8. 4 Williston, The Law of Contracts § 603 at 344-346 (3rd ed. 1961) :

> The standard most applicable to a bilateral transaction would seem to be that of reasonable expectation, that is, the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party. This is not a mutual standard, nor is it necessarily either the local standard or the individual standard. . . .

> Restatement of Contracts § 230 (1932) : The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean.

> The commentary makes clear that the "objective viewpoint of a third person is taken." The third person is, however, "assumed . . . to have knowledge of all operative

usages . . . as well as of other accompanying circumstances. Such usages may be confined to the parties themselves."

9. 4 Williston, The Law of Contracts § 603 at 344 (3rd ed. 1961) ; Restatement of Contracts § 227, Comment a(5) (1932).

10. Restatement of Contracts § 227, Comment a(6) (1932).

11. A & G also seizes upon the use by the trial court in its findings of the word "venture" to contend that a joint venture was established between the parties, and that general principles relating to a joint venture should apply. The elements of sharing a risk and right to control, however, are not present so that the sale agreement cannot be regarded as a joint venture, and even if it were so regarded, the specific provisions with reference to the method of accounting would still control, leaving us with the identical interpretive problems.

12. The court did disallow the sum of $200,000 claimed under an assignment of 20 percent of the gross profits of sale to Mr. Jett. There has been no appeal from the disallowance of that sum.

bold plans. The timing of the pipeline was uncertain. Nothing in the record indicates that Oma Day had the resources to develop the property, or even to hold it for a reasonable period when the predictable tax burden was imposed on it. Once the option was exercised, the Day/A & G sale guaranteed Oma Day $1,000,000 or the return of her property plus substantial liquidated damages. A & G bore the entire risk of loss. A & G did not have the resources to withstand a long hold-out of nonproductive property;[13] quick sale or development must have been intended and the contract was designed to give A & G maximum flexibility in pursuing options. Part of the flexibility must have been a recognition that expenses would be deducted from a resale if that became the only feasible option.

There is no indication that Mrs. Day was sophisticated in the technicalities of tax accounting. Nor did Mrs. Day in her testimony nor any member of her family who was present at the negotiations leading to the execution of the contract indicate an understanding that a technical meaning[14] was intended by the term "costs".[15] She was well aware that a substantial sum was to be paid her as the option price and we may reasonably conclude that she would consider all expenditures incurred in connection with the acquisition and development of the property to be deducted in the ascertainment of "net profits".

## II. "COSTS" INCURRED IN RESALE OF THE PROPERTY

■ The agreement provided for deduction of "costs incurred in connection with acquisition and development" of the property. Mrs. Day contends that costs incurred in connection with the resale of the property do not come under the category of "development" costs.

But from the outset, the agreement was made in anticipation of a resale of the property as a likely alternative to retaining it. A & G agreed to attempt to establish a marketable title, indicating that a sale was contemplated. While the agreement does not specify costs incurred in connection with a resale of the property, it is certainly

13. Review of the financial statement Def. Exh. A indicates chronic cash shortage. The Day property, carried at purchase price, represented between 20 and 33 percent of the company's gross assets.

14. Webster's New International Dictionary (2nd ed. 1960) gives the following definition of "costs":
1. The amount or equivalent paid, or given, or charged, or engaged to be paid or given for anything bought or taken in barter or for service rendered; charge; price, hence, whatever as labor, self-denial, suffering, etc. is requisite to secure benefit. . . .
2. Loss of any kind; detriment; deprivation; suffering. . . .
3. The expenditure or outlay of money, time, labor, or the like; as, to spare no *cost*; to live *cost* free.
4. *Obs.* a. Something expended; expense; also, in *pl.*, pains. b. That which has involved expense; a costly thing.
5. (Costs of lawsuits).
6. *Econ.* That which is sacrificed to obtain anything. The cost of production is by some measured in terms of the total waste of capital (including under that head economic goods of all kinds) and by others in terms of the pain or disutility involved in it. The cost of anything to a particular individual is called *private cost*, or often *expense*; the cost of anything to the community is called the *public cost*. . . . Since the price for which anything is ordinarily sold is essentially what is paid for it in money, *cost* is often used in the sense of price. In any enterprise involving large capital the costs or expenses are of two kinds: one set necessary for the management of the undertaking as a whole, such as administration, interest, taxes, and general maintenance; the other directly connected with particular portions of the business, taking the form of wages, supplies and special repairs. . . .
Significantly, Webster's does not even mention the highly technical accounting term which counsel seeks to apply to the contract in this case.

15. Mrs. Day did refer to the fact that A & G's attorney stated that "his costs would be the most". This statement, which was probably of a jocular nature, is readily explainable when considered in the light of the costs incurred in the initial purchase of the property from Mrs. Day.

reasonable to assume that this interpretation of "development" costs was within the expectations of one in Mrs. Day's position who was to receive a substantial purchase price with all outlay and risks of resale being the responsibility of A & G. We hold that under the circumstances of the execution of the agreement, costs of "development" included expenditures in connection with securing a sale of the property.

## III. SPECIFIC ITEMS IN DISPUTE

Our interpretation of the contract as utilizing the term "costs" in its broad commonly-understood meaning (rather than the narrow technical accounting definition) and as including costs incurred in the resale of the property, disposes of many of the disputed items.

Thus we affirm the lower court's allowance of the following items:

1. Payment of $5,000 to Mr. Jett as consultant fees for services rendered when he was engaged in activities leading to the acquisition of the Day property prior to his becoming an employee of A & G.

2. Expenses incurred with reference to development of magnetite—$16,400. At the time of the Day/A & G sale, it appeared that construction of the Alaska oil pipeline would require the use of substantial quantities of magnetite, a heavy-weight aggregate, for safety coating of the pipeline at river crossings and other exposed locations. One of the major development plans entertained at the time of A & G's purchase was to develop magnetite sites near the property (within a 200-mile range) and to establish an aggregate and cement plant on the property. Although Oma Day contends that A & G deducts the magnetite expenses as a cost of "sale", it appears that the company looked upon the magnetite prospects as a form of development of the Day property. The memorandum allows deduction of "costs incurred in connection with . . . development including . . . improvements on or for the benefit of the property." Development of the magnetite may be considered to be for the benefit of the property—it certainly was a development contemplated by the parties at the time of the sale—even though the magnetite was located miles away. Obtaining the magnetite was the first step toward retaining the Day property and establishing a plan for development of it by preparing cement coating for the entire Alaska pipeline.

3. Payroll and associated costs—$98,051. A & G seeks to charge 20 percent of its president's salary and 80 percent of Jett's salary for the period of time that A & G owned the property. Both figures were admittedly arbitrarily selected. No time records were kept to indicate the actual time spent by either man on the project. Atkinson estimated that at least one-fifth of his time was spent on matters directly related to the Valdez venture, and Jett's full-time job was the Valdez property.

■ Under our interpretation of the term "costs", the salaries of the officers and principal employees would be includable to the extent that their time was involved in the "development or acquisition". of the property. The trial court accepted the itemization, and there is no evidence to indicate that his implied finding approving the proration of time was clearly erroneous.[16]

4. Payment to other employees—$20,625. Oma Day challenges these items contending that there was insufficient evidence to relate them to the property. The uncontradicted testimony of Mr. Atkinson justified the expenses as related to either the development or sale of the property,

16. A trial court's finding of facts, including inferences in support thereof, will not be reversed on appeal unless clearly erroneous. *See* State v. Abbott, 498 P.2d 712 (Alaska 1972); Myers v. Sill, 497 P.2d 920 (Alaska 1972); Palfy v. Rice, 473 P.2d 606 (Alaska 1970); State v. Phillips, 470 P.2d 266 (Alaska 1970); Steward v. City of Anchorage, 391 P.2d 730 (Alaska 1964).

and we cannot find the trial court's allowance of these items clearly erroneous.

5. Profit-sharing trust, Atkinson and Jett—$9,638. A profit-sharing agreement required certain contributions to be made on a percentage-of-salary basis. The deduction claimed represents the amount contributed, based upon the estimated salary already charged to the contract. The amount was actually paid. The allowance of this item is wholly dependent upon the allowance of the basic salary deductions. Since we have held the salaries to be deductible, so are the contributions, *pro tanto.*

6. Other salary expenses—$3,533. Like the profit sharing, this item is the percentage of the actual disbursements of A & G for payroll taxes, FICA, ECA, employee liability insurance, workmen's compensation and other employee profit sharing based upon the relationship between Valdez work hours to the total work hours of other employees. It is allowable in the same manner that the basic salary of the other employees is allowable.

7. Travel, meals and lodging—$15,266. Each of the charges was itemized and the reimbursement checks coded "VZ" for Valdez were introduced into evidence. The trial court found that the expenses were substantiated by Mr. Atkinson's testimony, and we cannot hold the finding to be clearly erroneous.

8. Trailer—$2,779. A house trailer belonging to A & G was moved to Johnson's Trailer Park across Valdez Bay from the Day property in the fall of 1969 or the spring of 1970. The company had been operating some other unspecified project in the Valdez area at about the time of the Day/A & G sale, but this project was closed down before the trailer was moved to Valdez. The trailer was used for office and sleeping quarters for the company employees who were in Valdez working on the property development. Oma Day challenges the sufficiency of the evidence to relate the trailer to the Day property. The trial judge's decision must stand as it was not clearly erroneous.

9. Real and personal property taxes—$11,857. Once the broad general definition of costs has been adopted, there can be no argument as to the deductibility of the amounts paid for taxes assessed against the Day property. They were necessary costs incurred in holding the property for development or resale.

10. Miscellaneous items—$928. There was testimony that these items were for "some maps, title service, and a number of small items". These included boat repairs, inspection of the dock and escrow fees. We find no error in the court's allowance of these items.

11. "Additional Valdez Expense" ledger —$10,539.24. These included trailer expenses, costs of drilling and exploration work on the property, testing of magnetite samples, payment to a lobbyist, air transportation and payment of attorney's fees. There was testimony by Mr. Grundhauser, A & G's accountant, indicating that they were related to the Valdez venture and, accordingly, we find their inclusion supported by the evidence.

12. Interest paid directly to Mrs. Day —$95,019. Included in the costs listed by A & G was the interest paid to Mrs. Day under the $1,000,000 sales contract. The agreement specified that "costs" include the "purchase price" so that there is no question about deducting the amount of principal paid. Under the broad definition of "costs", it would appear that the interest paid to Mrs. Day was "in connection with the acquisition" of the property and thus properly chargeable.

We do not agree, however, that certain other interest items were properly deducted from the sales price, and we reverse the judgment as to the following items:

A. Interest on monies paid to Mrs. Day —$65,028. As a result of the outlays required by the purchase of Oma Day's land and by a "bad job", A & G was forced to borrow money from banks to stay in busi-

ness. A & G added the total amount of principal and interest paid to Mrs. Day ($400,000 principal and $95,000 interest) and computed the interest that would have been paid on it at 8 percent and 8¾ percent for different periods *as if* a bank loan in that amount had been taken on the date of payment and continued outstanding until the closing of the sale to Alyeska. The money which was borrowed, however, was never identifiably appropriated to payments made to Oma Day; Atkinson testified that the borrowed money was, in fact, used in the general construction business. His testimony was:

> Well, we didn't have the cash to buy this particular property. Not many people do. But the interest that we had to pay on the money that we borrowed *in our own construction business* was interest that, without the purchase of this property, would not otherwise have been to the company. It took all of the cash of the company, and then we had to borrow all the money to—to continue our construction business. We hit a bad job too, at the same time, which didn't help [emphasis added].

Since there was no evidence that this item of interest was paid in connection with the acquisition or development of the Day property as opposed to A & G's other financial activities, it cannot properly be included as a cost. Additional financing of A & G's other ventures was not a cost of acquisition or development of the Day property, and the trial court erred in including this sum as a deductible item.

B. Interest on the other expenses— $20,405. This claim is for the interest paid on expenditures made, other than payments to the Days. The figure was computed by figuring 8 percent of *all* expenditures otherwise claimed as deductions in this accounting except for payments to Oma Day and the disallowed assignment to Jett. There is no evidence that money was borrowed to pay any of the expenses for which this interest item is charged. As elucidated in the discussion of interest on

money paid to Oma Day, the claim for interest on money paid for expenses of development proceeds on the theory that the company was operating on borrowed funds, and thus no specific allocation is required. The difficulty with this interest item is the utter lack of proof that any particular item was financed or was paid for from generally borrowed funds. Thus the company failed to meet its burden of proof that this charge was actually "incurred" in connection with the property, and therefore the trial court's allowance of it was clearly erroneous.

## IV. THE PERSONAL JUDGMENT AGAINST MRS. DAY

The judgment entered against Oma Day was personal. A & G contended it was entitled to a personal judgment only if its expenses totalled more than the $400,000 on deposit in escrow. Since the judgment did not equal that amount, the trial court erred in awarding an in personam judgment against Mrs. Day.

The case is remanded for entry of a new judgment in accordance with this opinion.

Affirmed in part, reversed in part and remanded.

CONNOR, Justice (concurring in part, dissenting in part).

I agree with the majority opinion except that portion which deals with deducting $95,019 in interest paid directly to Mrs. Day by A & G Construction Co.

The purchase price of $1,000,000 was to be paid in installments, plus interest on the unpaid balance at 6% per annum. The interest represents compensation for the deferred payment of money owing to Mrs. Day. It is an obligation which is additional to payment of the purchase price itself.

The deduction of the interest in computing the net profits from the sale of the property results in Mrs. Day receiving an effective interest rate of 3% for the use of her money, i. e., the purchase price of the property. Had the parties intended this, it should have been stated expressly in the

memorandum of agreement. The agreement merely refers to

"All costs incurred in connection with the acquisition and development including purchase price and improvements on or for the benefit of the property."

The payment of interest was not, in my opinion, a cost of acquisition. It was a continuing obligation after the property had been acquired by A & G. Neither was the payment of interest a cost of development, as the interest in itself developed nothing. It did not add anything to the value of the property. It merely compensated for deferred payment of the purchase price.

Applying the standard of reasonable expectation of the parties, I conclude that one in the position of Mrs. Day would not have understood the language of the agreement to include interest as part of the costs to be deducted in computing the net profit realized from the purchase and resale of the property.

As to this item I would reverse the judgment below.