**AREA, INC., et al., Appellants,**

v.

**John C. STETENFELD, Appellee.**

**No. 2258.**

Supreme Court of Alaska.

Oct. 23, 1975.

**756**

Bernard J. Dougherty, of Cole, Hartig, Rhodes & Norman, Anchorage, for appellants.

Charles K. Cranston, of Gallagher, Cranston & Snow, Anchorage, for appellee.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and BURKE, JJ.

BOOCHEVER, Justice.

This appeal involves a dispute concerning the validity of certain shares of corporate stock improperly issued in exchange for a promissory note. The stock was the subject of a repurchase agreement between the corporation and its former manager-shareholder who paid the promissory note in full prior to commencement of the suit. Another issue involves whether the repurchase agreement can be rescinded because the book value, upon which the repurchase price of the shares was based, was determined by a method allegedly at variance with generally accepted accounting principles. The superior court ruled in favor of the manager-shareholder, and we affirm.

Appellant Area, Inc., an Alaska corporation, was organized in 1970 for the purpose of engaging in the real estate business. The firm was founded by Leslie B. Pace, Audie L. Moore and John C. Stetenfeld. Stetenfeld was to act as general manager and administrator of the corporation. Stetenfeld, although not claiming that he was an expert in accounting, did indicate that he would be able to keep the corporate books; during his association with the firm he was primarily responsible for their accuracy.

On June 4, 1970, at the first meeting of Area, Inc.'s board of directors, 2,500 shares of common stock were issued to each of the firm's three founders. Pace and Moore both contributed $2,500.00 in cash for their shares whereas Stetenfeld's shares were issued in return for his unsecured promissory note in the amount of $2,500.00. This promissory note was later paid in full by Stetenfeld prior to February 25, 1972.

In March 1972, due to various disagreements over his managerial practices, Stetenfeld resigned at the request of the

board. In conjunction with his resignation, Stetenfeld included within a general proposal to settle all outstanding accounts between Area, Inc. and Stetenfeld an offer to sell his stock[1] to the corporation. A general agreement to this effect was executed on March 20, 1972. In substance, Area, Inc. agreed to pay Stetenfeld the sum of $44,000.00 for 2,500 shares of stock in Area, Inc., computed at a rate of $17.60 per share. The per share value of the stock was arrived at by using the book value figure computed by Stetenfeld on February 29, 1972. Stetenfeld also received $5,241.25 for separation pay, and it was agreed that the combined sum of $49,241.25 was in full settlement of all debts owed to Stetenfeld by Area, Inc.

After Stetenfeld's departure, an audit of the company books was conducted by Lee E. Fisher, a certified public accountant. Mr. Fisher submitted to the board of directors a comparative statement of the firm's financial position as of February 29, 1972. The statement set forth the figures used in computing the repurchase price of the stock and indicated ten adjustments, the most significant of which involved accounting for tax liability on deferred commissions. As a result of these adjustments, a book value per share of $12.48 was determined, which was more than $5.-00 per share lower than the figure which had served as the basis for determining the purchase price of the stock in the March 20, 1972 agreement.

During the audit of the corporation, Mr. Fisher also had occasion to question the stock issued to Stetenfeld for his promissory note. The board requested an opinion from counsel and was advised that the shares which it had recently contracted to

repurchase had been improperly issued to appellee. Later, the board discontinued the monthly installment payments owed pursuant to the repurchase agreement.

On August 25, 1972, Area, Inc. instituted this suit in the superior court for rescission or reformation of the agreement of March 20, 1972, for declaration that the shares issued to Stetenfeld were void, and for damages from Stetenfeld for the costs of the audit. Stetenfeld answered the complaint and counterclaimed against Pace and Moore.

The case was heard before Judge James K. Singleton who found that the issue of the voidness of the shares issued to Stetenfeld was moot because the improper issuance had been ratified by the actions of the board and the shareholders and because all other claims of the parties had been extinguished by the general settlement of March 20, 1972. He further found that there were no facts established which would justify rescission of the agreement. Judgment in favor of Stetenfeld and against Area, Inc. was entered on May 13, 1974 awarding the former $40,103.60.[2] This appeal followed.

I

Concerning the issue of the validity of the stock issuance, Area, Inc. urges this court to reverse the lower court's decision and declare all shares issued Stetenfeld for his unsecured promissory note to be in direct contravention of AS 10.05.099(b) and therefore void ab initio as a matter of law. It is argued that such a result is the only one consonant with the important public policy embodied in the statute. According to Area, Inc., no other remedy or construction of the statute would effectively assure

---

1. This offer was made pursuant to art. VII, sec. 1 of the by-laws of Area, Inc. which provides in part:

 In the event a shareholder desires to sell his stock or withdraw from active participation in the corporation for any reason, he shall offer his stock to the corporation, and the corporation shall have the right to demand tender, with the price to be paid for the shares to be determined by the book value of the shares as that value appears on the financial statements of the corporation.

2. Amended judgment in the same amount was entered on May 14, 1974 against Area, Inc. and the defendants on the counterclaim, Pace and Moore.

the integrity of the capital stock statements appearing on corporate balance sheets and thereby protect the interests of those who may be defrauded if the corporation's alleged capital assets are in reality merely notes evidencing the indebtedness of a shareholder.

Stetenfeld, on the other hand, essentially argues that, even though his shares were admittedly issued in violation of the statute, such shares are not per se void but are merely rendered voidable by their unlawful origin. Stetenfeld further contends that the corporation's subsequent acceptance of payment in full on the note validated the initial issuance or, at least, rendered the shares no longer voidable.

We are not faced with the question of whether corporate shares can lawfully be issued for an unsecured promissory note. AS 10.05.099(b) expressly and unequivocally prohibits the use of such notes as consideration. Rather, the question concerns both the effect of the violation of the statute and the related issue of whether subsequent payment of lawful consideration can cure the original unlawful transaction.

■ Statutes and constitutional provisions which define the types of consideration which may be paid for the issuance of shares appear in at least two different forms;[3] however, they seek to promote the same general purpose: the elimination of the opportunities for and the likelihood of fraud surrounding the issuance of stock. Specifically, there was concern about the once well-known practice of corporations issuing shares of capital stock without re-

ceiving its par value in money or the equivalent of money.[4] Thus, statutes were designed to provide that the corporation should receive the full value of the stock when it was issued.

One type of provision is illustrated by Alaska Statute 10.05.099 (1962):[5]

(a) Consideration for the issuance of shares may be paid, in whole or in part, in money, in other property, tangible or intangible, or in labor or services actually performed for the corporation. When payment of the consideration for shares is received by the corporation, the shares are considered fully paid and nonassessable.

(b) A promissory note or future service does not constitute payment or part payment for shares of a corporation.

The second type is exemplified by art. IX, sec. 39 of the Oklahoma Constitution:

No corporation shall issue stock except for money, labor done, or property actually received to the amount of the par value thereof, *and all fictitious increase of stock or indebtedness shall be void* . . .. (emphasis added)

The major distinction between the two types of enactments is that the Oklahoma provision expressly voids the results of a violation of the section whereas the Alaska enactment contains no comparable language.

Most of the authorities cited by Area, Inc. in support of its contention that all shares issued in violation of AS 10.05.099 are void ab initio involve state constitutional or statutory provisions of the *Oklahoma* variety and are thus inapposite.[6] In

---

3. *See infra* Page 758.

4. For example, *see Chilson v. Cavanagh*, 61 Okl. 98, 160 P. 601, 602 (1916).

5. This statute is patterned after sec. 19 of the Model Business Corporation Act, which provides in pertinent part:
 The consideration for the issuance of shares may be paid, in whole or in part, in money, in other property, tangible or intangible, or in labor or services actually performed for the corporation. When pay-

ment of the consideration for which shares are to be issued shall have been received by the corporation, such shares shall be deemed to be fully paid and nonassessable.
 Neither promissory notes nor future services shall constitute payment or part payment for shares of the corporation.

6. *Hirschfeld v. McKinley*, 78 F.2d 124 (9th Cir. 1935); *Bank of Commerce v. Goolsby*, 129 Ark. 416, 196 S.W. 803 (1917); *Kahle v. Stephens*, 214 Cal. 89, 4 P.2d 145 (1931);

such cases the courts, in construing the term "void", relied on a word that is conspicuously absent from the analogous Alaska provision.[7]

Area, Inc. so much as concedes that even its own voidness per se argument is not absolute for it is willing to admit that when third parties are involved and when the equities weigh heavily in their favor, some courts will not consider the transaction void.[8] It attempts to distinguish those cases from the instant one since the controversy here exclusively involves the parties to the initial unlawful issuance. Equities may also be involved here, however, where a managing shareholder has devoted his efforts to building up the value of corporate assets. It may well be that without the prospect of enhancement in value of his shares of stock, he would have demanded a higher salary and possibly would not have had the same incentive as far as his hours of work and efforts were concerned.

Even under a constitutional provision containing the voiding language,[9] however, the Colorado Supreme Court recently held a shareholder to be liable on his promissory note issued to the corporation. In *Haselbush v. Alsco of Colorado, Inc.*, 161 Colo. 138, 421 P.2d 113 (1973), the court reasoned that since the main rationale of both the statutory and constitutional provisions is to prevent the watering of stock and the dilution of the capital of a corporation, these purposes would be better served by a decision allowing the corporation to enforce the payment of the note rather than a ruling which voided both the stock and the note.

■ Since Alaska has no provision voiding the issuance of stock, we need not gratuitously construe the term "void" and choose between those cases holding that the constitutional or statutory provision means void ab initio, and those cases which hold that the term means voidable only. We merely note that there are well reasoned cases presenting opposing constructions of the term "void".[10] We believe that the existence of a division of authority in jurisdictions having express voiding provisions bolsters our view holding that stocks issued in violation of AS 10.05.099 are voidable only, and that, in any event, once

*State ex rel. Weede v. Bechtel*, 239 Iowa 1298, 31 N.W.2d 853 (1948).

7. The comments of the Model Business Corporation Act give no reason for the abandonment of the "void" language. Some indication may be found in the statement that:

Creditors were the chief complainants in the so-called "watered stock" cases that arose in the late 19th and early 20th centuries. Creditor grievances are not numerous today, primarily because of the prophylactic effect of regulations of public service commissions, "blue sky" laws adopted in many states, and the Securities Act of 1933.

The valuation of property and services has always been and is today of importance also to existing shareholders vis-á-vis new shareholders, for overvalued consideration unfairly dilutes the interests of existing shareholders. 1 Model Bus.Corp.Act Ann. 2d § 19 ¶ 2 at pp. 435-36.

Thus the primary purpose for the provision today is to protect shareholders, particularly the existing ones, from future stock issuance watering down values.

8. *Washer v. Smyer*, 109 Tex. 398, 211 S.W. 985 (1919) (bona fide purchaser) ; *Thompson*

*v. First National Bank*, 109 Tex. 419, 211 S.W. 977 (1919) (following *Washer* and involving a suit brought by creditors on behalf of an insolvent bank).

9. Art. 15, sec. 9 of the Colorado Constitution was of the Oklahoma-type, expressly voiding "all fictitious increase of stock". Like Alaska's provision, however, Colorado Revised Statutes 31-4-5(2) (1963) read: "Neither promissory notes nor future services shall constitute payment or part payment, for shares of a corporation".

10. *Compare Hirschfeld v. McKinley, supra; Southwesterern Tank Co. v. Morrow*, 115 Okl. 97, 241 P. 1097 (1925), *with Haselbush v. Alsco of Colorado, Inc.*, 161 Colo. 138, 421 P.2d 133 (1973) ; *Bankers' Trust Co. v. Rood*, 211 Iowa 289, 233 N.W. 794 (1930) ; *Ramsay v. Crevlin*, 254 F. 813 (8th Cir. 1918). *Cf.* cases cited in note 6 which generally hold that the word "void" in their Oklahoma-type provisions does not apply to unlawfully issued stock (only to "fictitious increases"), and thus the transactions are rendered voidable without requiring the construction of the term "void" as "voidable".

valid consideration has been accepted by the corporation prior to suit, the issuance is validated.

 Area, Inc. points out that the statute would be rendered meaningless if the consent of the directors and the shareholders were held to legitimize a violation of AS 10.05.099. In most cases, the consent of the directors could have been obtained at the time of issuance since the corporations were for one reason or another willing to accept the shareholder's note. It appears to be well settled that the unlawful acts of a corporation or its agents cannot be validated by the acquiescence or consent of either the shareholders or the directors.[11] Here, however, we are not confronted with the question of whether the vote of a board of directors, without more, could validate such an issuance. The question is whether a corporation can validate or cure an unlawful issuance by acceptance of consideration which, if it had been proffered initially, would have made the issuance lawful.

*Ramsay v. Crevlin*, 254 F. 813 (8th Cir. 1918), is a typical case supporting Stetenfeld's contention that subsequent payment of a note can cure or validate the issuance of such shares.[12] The *Ramsay* case concerned a suit brought by the assignee of a note to collect the amount due from the maker. The note had been issued in exchange for shares of stock. In response to the objections of the other stockholders, the directors' paid the corporation cash in satisfaction of defendant's note a month after the stock was issued. The corporation signed the note over to the directors individually, and they in turn assigned their interest to Crevlin. The shareholder-maker tried to assert the voidness of the stock and the note as a defense. The court observed:

Conceding that the taking of the note and the issuance of the stock therefor before the note was paid constituted a violation of the statute was illegal, and contrary to the public policy disclosed by that statute, it does not follow that the payment of the corporation for that stock by the four directors . . . was either immoral or illegal, or against the public policy of the state. . . .

Again, while the statute declares that stock issued in violation of it shall be void, it does not follow that such stock is void in such a sense . . . that such stock may not be validated by the subsequent payment and receipt of the money for it.[13]

The court concluded that interpreting the word "void" in the statute as voidable was not only consistent with certain defensible rules of statutory interpretation, but also was the only way to effectuate the main purpose of the statute: to secure payment for a corporation's stock in money or its equivalent equal to the par value of the stock.[14]

The *Ramsay* case also involved an express agreement in which the shareholders waived their objections to the validity of the shares in return for the cash payment by the directors on behalf of the defendant. Prior to the director's agreeing to make the payment, they were promised repayment by Ramsay. This agreement was found to be valid and separable from the original issuance, and, therefore, even if the original shares were void and the note uncollectable, Ramsay could be held liable on the separate contractual obligation.

Thus, both alternate grounds of the *Ramsay* decision have some application to the instant case. In the first place, the subsequent payment of the note in February 1972 cured the invalidity of the shares or

---

11. *Kahle v. Stephens*, 214 Cal. 89, 4 P.2d 145 (1931); Tooker v. National Sugar Refining Co., 80 N.J.Eq. 305, 84 A. 10 (1912).

12. *See also Oklahoma Gas & Electric Co. v. Hathaway*, 192 Okl. 516, 138 P.2d 832

(1943); *Brownfield State Bank v. Hudson*, 73 S.W.2d 140 (Tex.Civ.App.1934).

13. 254 F. at 816–17 (citations omitted).

14. *Id.* at 819.

estopped Area, Inc. from raising the issue. Secondly, the March 20, 1972 settlement in which both parties surrendered all other claims they had against each other could be seen as a separate source of Area, Inc.'s liability.

In any event, there can be no possible harm after the note is paid in full, as occurred here prior to entry of the repurchase agreement and the subsequent suit. Even if there were subsequent shareholders who somehow failed to read a financial report so as to become aware of the note, any possible harm would be remedied by the payment of the note.

The legislature has not seen fit to prescribe specific penalties for failure to comply with the provisions of AS 10.05.099, and we have no intention of imposing such a harsh penalty as that suggested by Area, Inc., whereby the other shareholders would receive a totally unjustifiable windfall at the expense of a fellow original shareholder who entered into the organizational arrangement in good faith.

■■■ Our holding is directed to the factual situation presented in this appeal. In the event that we find that innocent shareholders or others are prejudiced as a result of watering of stock, we are confident that the Alaska courts will have little difficulty in fashioning an appropriate remedy.

AS 10.05.099 furnishes yet another reason for our holding against parties seeking the voidance of stock after payment of the promissory note given in consideration for its issuance. Subsection (a) provides in part: "When payment of the consideration for shares is received by the corporation, the shares are considered fully paid and nonassessable." Thus, while a promissory note does not constitute payment for the stock, once the note has been paid, the stock must be considered as fully paid. Under circumstances here present, we shall not void stock which under the statutory provision is to be "considered fully paid".

In conclusion, since: (1) the relevant Alaska statute does not void defectively issued stock but merely renders it voidable; (2) subsequent acceptance by the corporation of valid consideration validated the shares; and (3) pursuant to the March 20, 1972 settlement agreement, Area, Inc. surrendered all other claims it had against Stetenfeld, we hold that the shares of stock repurchased by Area, Inc. were valid and there was no failure of consideration.

## II

■■■ Appellants alternatively contend that the trial court erred by refusing to rescind the March 20, 1972 agreement whereby Area, Inc. bought out shareholder Stetenfeld. It is argued that this latter agreement was marred by a material mutual mistake of fact in that the book value of the stock was adjusted to reflect deferred compensation when no concomitant allowance was made for possible tax liability on this deferred income. As a result, the purchase price of the shares was based on an overvaluation, and the appellants insist that such an error constitutes an adequate ground for rescission.

In *Day v. A & G Construction Co., Inc.,* 528 P.2d 440 (Alaska 1974), we were confronted with a somewhat similar problem pertaining to the interpretation of the term "costs" when used in a contract. The question presented was whether the term should be given the technical tax accounting sense. We stated:

> Upon review of a trial court's decision pertaining to a contract, the interpretation of words is ordinarily held to be a matter for the court, while resolution of a dispute as to the surrounding circumstances is for the trier of facts. Here we have no basic dispute as to the surrounding circumstances, and we thus consider questions pertaining to the meaning to be given to the words of the contract in the same manner as questions of law.[15]

15. 528 P.2d at 443 (footnotes omitted).

Similarly, here there is no basic dispute as to the surrounding circumstances, and we must consider the question pertaining to the meaning to be given to the words "book value" in the same manner as a question of law.[16] In *Day*, we utilized the standard of the reasonable expectations of the parties in determining whether the trial court had properly interpreted the terms of the contract: "[A] reasonable man is placed in the position of the. parties, and the question is what he would reasonably expect that language to mean under the *circumstances*." [17]

Area, Inc.'s argument is based on the dual assumptions that there is only one proper definition of the term "book value", and that the ·parties to the repurchase agreement intended to use the term in a narrow technical sense. We are unable to accept the validity of either assumption.

In the first instance, both parties to this appeal refer the court to cases which discuss the term "book value" and which unanimously conclude that the term has no uniform or fixed meaning either in the legal or accounting professions. In this vein, the California court in *Pohlman Co. v. Easterling*, [18] stated:

> Defendant, however, asserts that the agreement, on its face, clearly and unambiguously requires inclusion of the omitted elements of value. The essence of his view is that "book value" of corporate stock is a term of fixed meaning, and requires inclusion of market value

of each corporate asset listed on the books.

But "the law does not define 'book value'". A court must look to the language of the agreement and to the significant circumstances surrounding its formulation and execution, and from all these determine the intent of the parties

. . . .

This principle conforms with that part of the trial court's findings of fact and conclusions of law entered May 13, 1974, wherein Judge Singleton stated:

### XXII

Authorities differ widely on which financial ingredients make up the assets and liabilities properly to be included in a calculation of book value, but agree that book value is neither helpful nor indicative of the true value of shares of corporate stock.

### XXIII

The term "book value" does not involve a universally agreed value for any particular set of books of account.

### XXIV

The parties to this action employed their term "adjusted book value" for internal use in evaluating the financial posture of their corporation.

These findings were also supported by the testimony of the parties' expert witnesses.[19]

---

16. The burden of proof to be used in those reformation cases where there is a factual dispute concerning surrounding circumstances is discussed in *Gablick v. Wolfe*, 469 P.2d 391, 395 (Alaska 1970) ; *Durkee v. Busk*, 355 P.2d 588, 591 (Alaska 1960).

17. 528 P.2d at 444. We concluded that under the circumstances presented in *Day*, the term "costs" was not to be given a technical tax accounting meaning.

18. 211 Cal.App.2d 466, 27 Cal.Rptr. 450, 450–51 (1962). *See also Lassallette v. Parisian Baking Co.*, 110 Cal.App.2d 375, 242 P.2d 671 (1952) ; *Aron v. Gillman*, 309 N.Y. 157, 128 N.E.2d 284, 286 (1955).

19. Mr. Rompa, Stetenfeld's expert witness, stated that although he, as a certified public accountant, would have included an adjustment for deferred taxables payable, its omission would not necessarily render the book value thus obtained any less "true". Both Mr. Rompa and Mr. Fischer, expert witness for appellant, generally agreed with the trial court that book value refers to a balancing of assets and liabilities divided by the number of shares of ownership. Furthermore, both of the expert witnesses believed that the accounting principle involved here, that of including a figure for future tax on deferred income, was a relatively sophisticated one not likely to be one familiar to a businessman

As admitted by both parties to this appeal, Area, Inc. computed book values by including in its assets 100 percent of deferred commissions receivable plus 80 percent of anticipated brokerage commissions on transactions awaiting closing. Using this method, the board of directors for purposes unrelated to the purchase of Stetenfeld's stock determined the book value of the shares to be $9.91 per share as of September 14, 1971 and $14.93 per share on January 19, 1972. Appellee Stetenfeld makes reference to two other instances where book value, calculated as outlined above, was relied on in stock transactions. Mr. Pace also testified that the same method was used several times to calculate book value. There thus was ample precedent for the method used to calculate the book value of Area, Inc. stock on February 29, 1972 which book value ($17.60 per share) was the basis of the March 20, 1972 agreement between Area, Inc. and Stetenfeld for the purchase of Stetenfeld's stock. We hold that there is adequate support for the trial court's findings that all parties to the March 20, 1972 buyout agreement were fully cognizant of the various factors making up the "adjusted book value" of the corporate shares as it was reflected in the February 29, 1972 financial statement. It had been the consistent practice of the corporation to expend corporate income on salaries, commissions, bonuses and other like distributions in an effort to minimize or eliminate taxable corporate income, and the corporation, in fact, incurred no income tax liability for any period relevant herein. Indeed, there was some testimony by Stetenfeld to the effect that he, Pace and Moore had discussed the likelihood of the continued absence of taxable corporate income in connection with a certain loan application. Stetenfeld stated that each party recognized that no such taxable income was anticipated for several years, and that a conscious decision by the board of directors had been made at that time not to include an estimate of potential tax liability in the loan application. Moore testified that there never was a discussion of tax liability, and Pace stated that he could not recall any such discussion. In any case, there is ample support that the trial court's finding that, based on the corporation's past record of income distribution, the parties could have reasonably concluded that no corporate tax liability would be created upon receipt of future receivables.

In conclusion, we hold that under the facts of the instant case as found by the trial court, there was no reason to believe that a mistake of any kind—mutual or otherwise—was made by either of the parties to the agreement. In so holding, we do not mean to suggest a rule of general application in determining "book value", as we recognize that inadvertent departure from accepted accounting techniques in the context of a corporation that in principle sought to adhere to those techniques or that historically generated taxable income might lead to a contrary result.[20] Here,

---

such as Stetenfeld who was versed only in the fundamentals of accounting.

20. *See Aron v. Gillman*, 309 N.Y. 157, 128 N.E.2d 284, 288 (1955), where the New York Court of Appeals commented:

Clearly it makes no sense to charge the entire year's burden of income taxes to the income of the last month preceding termination of the taxable year. *On the contrary, sound accounting practice requires that each dollar of income as it is earned throughout the year should bear its proportionate share of the costs of the enterprise, including the tax burden, . . . ..*

Moreover, judicially, we must recognize that income taxes are continuing and reasonably predictable charges against corporate income. Their influence pervades modern business. Rare indeed is the corporation or businessman who is not acutely aware of their incidence and effect upon its or his operations. Under such circumstances, to accept defendants' argument that these taxes must be ignored because they weer not yet "liabilities" would be to subject our reason to what Mr. Justice Cardozo termed "the tyranny of labels". *Snyder v. Com. of Massachusetts*, 291 U.S. 97, 114,

however, the parties had developed a method of computing book value which had been approved by the board of directors and which had been consistently utilized in the course of several prior stock transactions. There was no ambiguity whatsoever in regard to the factors which were to be taken into consideration. We hold that, since as a matter of law the term "book value" has no fixed meaning, the intent and understanding of the parties to the individual agreement must control. Whereas generally accepted accounting principles cannot be

entirely disregarded in determining book value, technical variations from them cannot per se be deemed fatal errors especially in cases such as this, where the alternate method employed was well established and had, at one time, the approval of the board of the appellant corporation. The equitable remedy of rescission was therefore rightfully withheld by the trial court.

With regard to both allegations of error, the judgment of the trial court is affirmed.

Affirmed.

54 S.Ct. 330, 335, 78 L.Ed. 674. *If a corporation, such as here, has earned a given net income over the first seven months of its tax year, it is only reasonable that the* tax *which will be payable on that income should be included in a determination of its financial position in terms of book value.* (emphasis added).